CAROL DEAN DULEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ORVILLE E. DULEY AND DOROTHY R. DULEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Duley v. Commissioner
Docket Nos. 3136-79, 6632-79.
United States Tax Court
T.C. Memo 1981-246; 1981 Tax Ct. Memo LEXIS 497; 41 T.C.M. (CCH) 1521; T.C.M. (RIA) 81246; May 20, 1981. Carol Dean Duley, pro se. Phillip Singer, for petitioners in Docket No. 6632-79. Alan J. Pinner, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases respondent determined the following deficiencies in the Federal income taxes of petitioners: Petitioners
Docket No.
Year
Amount
Carol Dean Duley
3136-79
1975
$ 3,017
Orville E. Duley
and
6632-79
1975
$ 8,057
Dorothy R. Duley
After concessions by the parties the remaining issues for decision are: 1. Were petitioners Orville E. Duley and Dorothy R. Duley engaged in a trade or business or an activity for profit during the year 1975 and therefore entitled to claim a business loss under section 165[1] for the certain expenditures? 2. If the first issue is decided in the affirmative, was *501 there a partnership between petitioners Orville E. Duley and Dorothy R. Duley and Carol Dean Duley, and, if so, did the written agreement between them limit Orville and Dorothy to 25 percent of the losses? 3. Is petitioner Carol Dean Duley entitled in 1975 to the foreign income exclusion provided for by section 911? FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and the accompanying exhibits are incorporated herein by this reference. Orville E. Duley (Orville) and Dorothy R. Duley (Dorothy) resided in Redondo Beach, California at the time they filed their petition herein. Carol Dean Duley (Dean), brother of Orville, resided in Los Angeles, California at the time he filed his petition herein. Orville and Dorothy filed a joint Federal income tax return for the taxable year 1975. Since Dorothy was not an active participant to the transactions in question, we generally refer only to Orville herein. Dean filed a joint Federal income tax return with his then wife, Pauline Duley (Pauline), for the taxable year 1975. Dean and Pauline Duley were divorced subsequent to 1975. Although Pauline is not a petitioner, she did testify *502 for Dean and Orville. Dean attended the University of Missouri where he received both a bachelor's degree and a master's degree in business administration. He and Pauline were married on December 25, 1962. He was employed as Director of Management Services for the Whirpool Corporation in Evansville, Indiana from January 1966 until July 1968. Thereafter, he formed a computer services corporation in Evansville and was the president and majority shareholder of that company until July 1970. In September 1970 Dean, Pauline and their two children sold their home in Indiana and moved to Beirut, Lebanon. There they rented apartment space from Pauline's brother, Nicholas Hazarian, an attorney. She and her two children resided continously in Lebanon from September 1970 until June 28, 1975. The children were enrolled in Lebanese schools and fully assimilated into the Lebanese culture. Dean resided with his family but often traveled in the Middle East and occasionally returned to the United States for business. Dean intended to promote business ventures in the Middle East involving American companies. He hoped his wife's language ability and contacts would help the success of these *503 ventures. Pauline had been born in Lebanon and lived there until she was 23 years old. She, her parents and her brothers were alls Lebanese citizens. She attended schools and college in Lebanon. In 1960 she came to the United States to further her education. She became a naturalized American citizen in 1967 but under the law of Lebanon she is still considered a Lebanese citizen. Pauline's family was well known in Lebanese society. Her father was the Dean of Opticians in Beirut. Her mother had been decorated by the wife of the President of the Republic for her social work. Pauline was personally acquainted with the President and Prime Minister of Lebanon as well as a number of Deputies of Parliament. She and her family had many contacts among the business and professional community of Lebanon and in the Middle East. Pauline speaks Arabic, the official language of Lebanon and many other Middle Eastern countries, and French, the second language of Lebanon. She is also fluent in English, Armenian, Turkish and Italian. Dean started the American Middle East Company, a sole proprietorship, as a vehicle for his promotions. He was also a foreign sales representative for a large *504 U.S. cable manufacturing corporation. Pauline handled her husband's business cables, telexes, telephone inquiries, business letters and correspondence. She also set up his appointments, followed up transactions and entertained business contacts. Dean used the law offices of Pauline's brother Nicholas and the offices of another business associate as bases of operations. Dean stayed in Lebanon on a 6 month renewable visa. He did not maintain bank accounts in Lebanon but used local banks to cash checks and to engage in foreign exchange transactions. Lebanon has no income taxes for which Dean would have been liable. Early in 1974 Charles Morris of Morris Newspaper Corporation, a chain of 26 newspapers, called Dean while he was in the United States with an idea about publishing a newspaper supplement entitled "Peace in the Middle East." The four issue, full color supplement was to be created by the Morris Newspaper Corporation and be available to run in every American daily newspaper. He planned to have Middle Eastern countries and American corporations finance the supplement. The Morris Newspaper chain paid all of Dean's expenses in the early stages of organizing the project, *505 and he agreed not to compete with it for the duration of the venture. Dean arranged for Mr. Morris to meet with the Kuwaiti Ambassador to the United States and King Faisal of Saudi Arabia. He also arranged an all-expenses-paid trip for Mr. Morris and himself to Saudi Arabia as guests of King Faisal, where they visited Dhahran, Riyadh and Jedda, and met with the American Ambassador and officials of the Saudi Arabian government. On November 4, 1974, King Faisal agreed to proceed with the Peace in the Middle supplement. Mr. Morris then returned to the United States and left Dean to continue the preparations in the Middle East. In mid-November 1974 certain disagreements developed between Dean and Mr. Morris regarding the supplement. Dean was concerned that the venture was not sufficiently funded in the early stages to allow him to complete the Middle Eastern part of the deal. He believed his commission, if the supplement ran as contemplated, could be as high as $ 2.5 million. In December 1974 Dean contacted his brother Orville back in California. Dean explained the nature of the venture in progress, the problem of inadequate funding, and his willingness to share some of his *506 commission in return for some financing at that critical time. Thereafter it became necessary for Dean to have a face-to-face meeting with Mr. Morris to resolve their disagreements and conclude their business understandings. Dean returned to the United States on February 17, 1975 and spent a week meeting with Mr. Morris. At that time Mr. Morris expressed grave doubts about continuing the venture. Dean then traveled to California to meet with Orville in early March 1975 to explain his predicament and solicit funds to continue on. Orville and his wife Dorothy were both teachers. They matched their teaching salaries through income generated by starting and selling small businesses, such as a restaurant, a pastry shop, and a car wash, and by investing in rental real estate. Orville and Dean were not particularly close. Other than occasional small presents for a birthday, Orville never gave a gift to Dean in the preceding thirty years. Orville thought of himself as a businessman-investor. Dean explained that Mr. Morris was having doubts about the viability of the venture, but that all the preparatory work had been done and with additional financing he could still save the supplement *507 and collect a substantial commission. Orville was shown pictures of King Faisal of Saudi Arabia and Dean, and was told that the King was a chief figure in the investment. Orville believed contracts had been signed and the preliminary work had been completed. Even if Mr. Morris were attempting to back out of the venture, Orville believed the obligations of the contracting parties would be fulfilled within a short time. He recognized there was a high degree of risk involved but it was his opinion that the high profits accruing to him if the venture should succeed justified an investment. On March 25, 1975, while Dean was visiting Orville, they learned that King Faisal had been assassinated. Soon thereafter, Mr. Morris decided not to pursue the supplement venture. In mid-April 1975 civil strife broke out in Lebanon. Pauline and the children still were in Beirut. She had no indication when the fighting would stop, and telephone and mail service between Lebanon and the United States was disrupted. As the disturbances and fighting continued in Beirut, Dean thought it advisable for his family to leave. He was ultimately able to telephone Pauline and cable her the necessary airfare. *508 Sometime in April or May of 1975, Orville, Dorothy and Dean executed the following undated agreement: AGREEMENT
This agreement, by and between Gene [2] and Dorothy Duley (G/DD) and C. Dean Duley (CDD), doing business as American Middle East Company, is as follows: 1. The term of this agreement is from January 1, 1975 to July 1, 1975. 2. This agreement may be renewed and/or revised by mutual consent of G/DD and CDD. 3. CDD agrees to represent G/DD for the purpose of two-way trade, joint ventures, investments, finance and related transactions between the United States and the Middle East, and elsewhere as appropriate. 4. G/DD agree to pay for relocation expenses of Dean, Pauline, Mark and Mead Duley from Beirut, Lebanon to Los Angeles, California upon termination of this agreement, and to pay for moving expenses of CDD family furnishings and furniture from Evansville, Indiana and Poplar Bluff, Missouri to Los Angeles, California. 5. G/DD agree to pay CDD a retainer fee of $ 18,000 in consideration of services performed under paragraph 3 above. 6. G/DD agree to pay CDD for all out-of-pocket *509 business expenses incurred hereunder, including travel, telephone, telex, cable, postage, supplies, publications, business entertainment and related expenses: * G/DD agree to provide CDD with an expense account advance of $ 400 and to replenish this account periodically as required, based upon expense reports, receipts and appropriate documentation which CDD hereby agrees to submit. * Monthly business expenses hereunder not to exceed $ 400, unless approved by G/DD. * Total business expenses for period January 1, 1975 to July 1, 1975 not to exceed $ 2,400 unless approved by G/DD. 7. G/DD agree to pay CDD during 1975 a consulting fee equivalent to $ 500 per month, total of $ 3,000 for services performed under paragraph 3 above. 8. CDD agrees to share equally (50% - 50%) with G/DD all fees, commissions and other compensation earned hereunder, after reimbursing G/DD for accumulated business expenses paid by G/DD hereunder, up to $ 50,000 income to G/DD, and thereafter to share such income after business expenses on the basis of 25% to G/DD and 75% to CDD. ACCEPTED: /s/ Gene Duley / GENE DULEY /s/ Dorothy Duley / DOROTHY DULEY /s/ C. Dean Duley / C. DEAN DULEY
*510 Orville did not intend to form a partnership with Dean. He wished to limit his liability to only the amounts he actually expended because he feared the unlimited liability of a general partner in this type of large-scale venture. Pursuant to the agreement, Orville paid Dean the following amounts: $ 18,000 by check dated May 30, 1975; $ 523.24 by check dated June 1, 1975; and $ 445.06 by check dated June 21, 1975. Orvidlle also paid $ 4,762.79 in relocation expenses for moving Dean and his family to California. Orville testified that in April of 1975 he thought Dean would be returning to the Middle East to continue with the venture, despite the withdrawal of the Morris Newspaper Corporation, and that he was not aware of the extent of the civil disturbances in Lebanon. Orville still expected the venture to be completed. He estimated he would earn at least $ 250,000 in a very short period. Over the months the fighting in Beirut intensified and on June 26, 1975, Pauline and the children fled Lebanon. On their way to the airport they traveled in a Red Cross ambulance which was fired upon. They reached the United States on June 28, 1975. After Pauline arrived, Orville reassessed *511 the situation. He concluded that, with a civil war developing in Lebanon, the business prospects at that time for a Peace in the Middle East newspaper supplement were not good. At the same time, however, he believed that the turmoil in the Middle East might encourage a flow of capital seeking safety to the United States. Since Dean and Pauline still had their contacts abroad, he thought they could channel Middle Eastern money into California real estate investments. If this were possible, Dean and Orville could split the finder's fee. Orville thought he could recoup his investment in the supplement venture by investing more money with Dean and Pauline. Sometime on or after July 1, 1975, Orville, Dorothy and Dean executed the following second undated agreement: AGREEMENT
This agreement, by and between Gene and Dorothy Duley (G/DD) and C. Dean Duley (CDD), is as follows: 1. The term of this agreement is from July 1, 1975 to June 30, 1976. 2. This agreement may be renewed and/or revised by mutual consent of G/DD and CDD. 3. CDD agrees to represent G/DD in real estate transactions, finance, investment and related areas as appropriate and as mutually agreed upon. *512 4. G/DD agree to pay CDD all out-of-pocket business expenses incurred hereunder, including travel, telephone, telex, cable, postage, supplies, publications, business enterainment and related expenses: * G/DD agree to replenish CDD expense account periodically as required, based upon expense reports, receipts and appropriate documentation which CDD hereby agree to submit. * Monthly business expenses hereunder not to exceed $ 400, unless approved by G/DD. * Total business expenses for period July 1, 1975 to June 30, 1976 not to exceed $ 4,800, unless approved by G/DD. 5. G/DD agree to pay CDD a consulting fee of $ 3,000 for services performed under paragraph 3 above, installments to begin in 1976 monthly in the amount of $ 500 on the 1st of January, February, March, April, May and June. 6. CDD agrees to share equally (50% - 50%) with G/DD all fees, commissions and other compensation earned hereunder, after reimbursing G/DD for accumulated business expenses paid by G/DD hereunder. ACCEPTED: /s/ Gene Duley / GENE DULEY /s/ Dorothy Duley / DOROTHY DULEY /s/ C. Dean Duley / C. DEAN DULEY Pursuant to the first agreement Orville paid Dean the following amounts: *513 Date
Amount
August 6, 1975
$ 500.00
August 31, 1975
500.00
September 28, 1975
400.00
September 28, 1975
551.40
October 13, 1975
500.00
November 3, 1975
500.00
December 1, 1975
500.00
Total
$ 3,451.40
Of this total, $ 3,000 was for consulting services performed by Dean during 1975. The balance ($ 451.40) was apparently for out-of-pocket business expenses. Some of the $ 3,000 was used by Dean and Pauline for purposes covered by the second agreement (such as the cost of classes necessary to attain their California real estate salesperson and broker licenses). During the period from July 1, 1975 through December 31, 1975, Dean wrote letters and attempted to reestablish contact with potential real estate investors in the Middle East but no business was generated. On their 1975 joint Federal income tax return Orville and Dorothy completed Schedule C (which is used to report the profit and loss from a sole proprietorship) and reported no income and the following expenses for the American Middle East Company: Dues and subscriptions
$ 91
Office supplies and expenses
2,860
Telephone
365
Outside services-foreign rep.
21,000
Miscellaneous
2,790
Total
$ 27,106
*514 This created an ordinary loss of $ 27,106 which they applied against their other income. On their 1975 joint Federal income tax return Dean and Pauline also completed Schedule C. They listed their sole proprietorship as the American Middle East Company and reported $ 13,512.79 of income and $ 321.05 of deductions, consisting of legal fees, insurance and newspaper subscriptions, resulting in a net profit of $ 13,191.74. Dean calculated the $ 13,512.79 figure by using Form 2555 (Exemption of Income Earned Abroad). On that form he included as earned income for personal services rendered in a foreign country $ 21,000 of wages (the $ 18,000 paid on May 30, 1975 and the $ 3,000 paid between August 6 and December 1, 1975) and $ 4,762.79 of relocation expenses, for a total of $ 25,762.79. From this figure they excluded an exemption under section 911 which they computed to be $ 12,250. [3]
*515 OPINION Issue 1. Section 165 Business Loss
Orville claimed a loss on Schedule C of his 1975 Federal income tax return of $ 27,106 resulting from a venture which produced no income. The parties have stipulated that Orville made payments to Dean relating to the venture in the amount of $ 22,419.80. At trial Orville failed to produce any evidence, beyond that which had been previously submitted and stipulated, to support the claimed business expenses, even though the majority of the expenses claimed were susceptible to proof by documentation. In his opening brief Orville appeared to concede that the amount of deductions in issue was equal to the stipulated figure of $ 22,419.80, rather than the $ 27,106 originally claimed on his return. In his reply brief, however, Orville appeared to reassert the $ 27,106 amount.d We hold that, as to the amounts in excess of the stipulated expenditures of $ 22,419.80, Orville has failed to prove that such expenditures were incurred. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. The remainder of the discussion on this issue will relate only to the $ 22,419.80 amount. *516 Orville claims entitlement to section 165 on the ground that the loss claimed was incurred either in a trade or business, or in a transaction entered into for profit. Since we decide this issue on whether the transaction was entered into for profit, we need not address the question whether the losses were incurred in a trade or business.
Section 165 provides, in pertinent part, as follows: (a) General Rule - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (c) Limitation on Losses of Individuals - In the case of an individual, the deduction under subsection (a) shall be limited to - (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business. Section 165(c)(2) allows a deduction for losses incurred in any transaction entered into for profit. In enacting this provision Congress intended to allow a deduction for activities which are something less than the carrying on of a trade or business and something more than the mere casual preliminary *517 investigation of a prospective business or investment. Seed v. Commissioner, 52 T.C. 880, 885 (1969). A loss is deductible under section 165(c)(2) only if the taxpayer's motive or intent in entering the transaction was primarily for profit. Ewing v. Commissioner, 20 T.C. 216, 233 (1953), affd. 213 F.2d 438 (2d Cir. 1954). See also Helvering v. National Grocery Co., 304 U.S. 282, 289, n.5 (1938). Whether or not a taxpayer has the requisite intention or motive to make an enterprise profitdable is a question of fact to be determined not only from the taxpayer's testimony, but also from a consideration of all the evidence. American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1111 (1957), affd. 262 F.2d 150 (9th Cir. 1958); DuPont v. United States, 234 F. Supp. 681, 685 (D. Del. 1964). The expectation of the taxpayer to make a profit need not be objectively reasonable but must be held in good faith. Hirsch v. Commissioner, 315 F.2d 731, 736 (9th Cir. 1963); *518 DuPont v. United States, supra; Wright v. United States, 249 F. Supp. 508, 513 (D. Nev. 1965). The facts relative to this issue are as follows: In December 1974 Orville was contacted by his brother Dean, who had been living in Lebanon for several years, concerning a newspaper supplement project in which he was involved. Dean was concerned that the project was not sufficiently funded and might fail just short of fruition for lack of adequate financing. The project's main financial backer had been a publisher of 26 American newspapers who believed the supplement (entitled "Peace in the Middle East") could run in many U.S. newspapers and help promote peace in that part of the world as well as yield substantial profits. Dean, who had worked on this project for almost a year, estimated his commissions could be as high as $ 2.5 million should the supplement be a success. In March 1975 Dean met with Orville at his home in California and discussed the project at length. Orville believed that the contracts had been signed and all the parties would meet their contractual obligations. On March 25, 1975, while Dean was still visting Orville and before *519 any written agreement had been signed between them, King Faisal, a sponsor of the project, was assassinated. Soon thereafter the newspaper publisher abandoned his part in the venture. In mid-April civil strife began in Lebanon where Dean's wife, Pauline, and their two children were residing. Sometime in April or May of 1975 Orville and Dean drafted an agreement covering the period January 1, 1975, to July 1, 1975 providing for the payment to Dean by Orville of substantial sum of money and for the payment by Orville of the moving expenses to California for Dean and his family. Orville paid Dean an $ 18,000 retainer fee for his work in setting up the venture on May 30, 1975, and $ 968.30 by two checks in June 1975. On June 28, 1975, Pauline and her children arrived in the United States after escaping the intensified fighting in Lebanon. Dean, Pauline and their children stayed with Orville and Dorothy. Soon thereafter, Orville reassessed the situation. He believed the fighting which by July 1975 had developed into a civil war put an end to any chance of success for a "Peace in the Middle East" newspaper supplement. He theorized that because of the hostilities in Lebanon many *520 people in the Middle East would seek to invest in the United States. He thought that Pauline and Dean with their Middle Eastern contacts and experience could help channel those funds into California real estate and earn commissions which they would split with him. On this assumption, Orville and Dean entered into a new agreement covering the period July 1, 1975 to June 30, 1976 providing for the payment by Orville of Dean's monthly business expenses during 1975 and 1976, and $ 3,000 of consulting fees to Dean in 1976. Although Dean tried to contact potential investors in the Middle East in 1975, no income on real estate transactions was earned in 1975. Respondent argues that the two events, the assassination of King Faisal and the outbreak of hostilities in Lebanon, terminated the possibility of any further business activity in the Middle East. He further contends that Orville never intended to make a profit from the moneys paid to Dean but only intended to help his brother and family in a time of need. We disagree in part. We think that the $ 18,000 Orville paid Dean on May 30, 1975 and the two subsequent checks of $ 523.24 on June 1, 1975 and $ 445.06 on June 21, 1975 were *521 paid with the primary intention and good faith expection of making a profit. Orville was a well-educated businessman who received approximately one-half his income during the year at issue from his investments. We found Orville to be a sincere and credible witness. He stated that he believed the contracts were signed and the preliminary work was complete. He deferred to his brother's experience in Middle Eastern affairs. Although he was aware of King Faisal's death and the civil strife in Beirut, we think that at the time he signed the agreement and issued the aforementioned checks, he believed King Faisal's successor would carry on the obligations of Saudi Arabia as to the newspaper supplement and that the civil disturbances in Lebanon were of a temporary nature and not the type that would vitiate the supplement project. Even Pauline, who was born and raised in Lebanon and was living there at the time of the first outbreak of civil disturbances in mid-April, testified that when the fighting began no one knew if it would stop the next day or not. Orville knew it was a high risk invstment but he believed the large profits (at least $ 250,000) that could be achieved in a short *522 time justified the investment. An opportunity to earn a substantial ultimate profit in a highly speculative venture can be sufficient to indicate the transaction is entered into for profit. See section 1.183-2(b)(7), Income Tax Regs.
As for the money he paid for the relocation of Dean and his family to California, we think it was not paid with the primary motive of making a profit. Although moving expenses can be eligible for the business expense deduction provided by section 162, the facts in this particular case demonstrate that the primary motive was Orville's desire to help his brother and family in a time of need. As such the expenditures cannot come into the computation of loss deductible under section 165(a)(2). Ewing v. Commissioner, supra; Sutherland v. Commissioner, T.C. Memo. 1966-155. We note that Orville did not claim the relocation expenses on his 1975 Schedule C as a business expense. We conclude, therefore, that this amount represented a gift. Commissioner v. Duberstein, 363 U.S. 278 (1960). *523 As a gift these amounts would not be includable in Dean's gross income for 1975. Section 102. Sometime after July 1, 1975, Orville and Dean drafted a new agreement to cover the period from July 1, 1975, through June 30, 1976. Although some of the language of the second agreement is similar to that of the first agreement, the testimony at trial indicates that it was a new venture, rather than a continuation of the first association. Orville hoped to recoup the losses he suffered in the first deal from profits generated by this second and new undertaking. Orville and Dean planned to attract Middle Eastern investors, who, because of the turmoil in Lebanon and other areas, might want to move their capital to the United States and invest in California real estate projects. Although the first agreement (covering January 1, 1975, through July 1, 1975) relating to the supplement project provided for the payment of $ 3,000 in consulting fees by Orville to Dean in 1975, while the second agreement (covering July 1, 1975, through June 30, 1976) relating to the California real estate investing did not provide for the payment of any consulting fees until 1976, the evidence adduced at trial *524 indicated that the $ 3,451.40 paid by Orville between August 6, 1975 and December 1, 1975 related to the California real estate investment venture. We have previously held that the words "any transactions entered into for profit" in section 165(c)(2) mean something more than mere casual preliminary investigation of a prospective business or investment. Seed v. Commissioner, 52 T.C. 880, 885 (1969). Expenses incurred in the course of a general search or a preliminary investigation of a business, such as expenses related to the decisions whether to enter a transaction and which transaction to enter, are not deductible under section 165(c)(2). O'Donnell v. Commissioner, 62 T.C. 781 (1974), affd. without published opinion, 519 F.2d 1406 (7th Cir. 1975); Frank v. Commissioner, 20 T.C. 511, 514 (1953). Orville has failed to prove that his expenditures pursuant to the second agreement were other than a general search for suitable business property and prospects. Dean testified in a vague manner regarding only the most general *525 and minimal efforts on his part to pursue this possible business. Dean and Pauline were not licensed to sell real estate at the time the agreement was signed, nor were they familiar with the California real estate market. Some of the money was used by Dean and Pauline to pay for their course work necessary to qualify them in a new trade or business, that of real estate salespersons and brokers. Under these circumstances we find the $ 3,451.40 of expenditures made between August 6, 1975 and December 1, 1975 were personal and are not deductible under section 165(c)(2). Section 262. We think, however, that the $ 3,000 of consulting fees was not meant as a gift. Commissioner v. Duberstein, supra.Since it was an accretion to wealth, it is "income from whatever source derived," and includible in Dean's gross income under section 61. To summarize, we hold that $ 18,968.40 is the proper loss to Orville deductible under section 165(c)(2); that the $ 4,762.79 payment representing the cost of moving Dean and his family to California was a gift not deductible by Orville and not includible by Dean; that the $ 3,451.40 payment for consulting fees and business expenses *526 was a non-deductible personal expenditure to Orville but $ 3,000 thereof is includible in Dean's income. Issue 2. Partnership
Respondent argues that, if the Court should determine that Orville and Dean were engaged in an activity for profit during 1975, the association between the two brothers was a partnership and under the language of the first agreement Orville would be entitled to only 25 percent of the losses.
Section 761(a) defines a partnership to include any "syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a corporation or a trust or estate." Whether a partnership existed is a question of fact. Commissioner v. Tower, 327 U.S. 280 (1946). It is possible for a partnership to be created without any announced intention of the parties to do so. Grove v. Commissioner, 54 T.C. 799 (1970). The Supreme Court stated in Commissioner v. Culbertson, 337 U.S. 733, 742 (1949), regarding the *527 determination of whether a partnership should be recognized for income tax purposes: The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower case, but whether, considering all the facts--the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent--the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * * Under the particular facts and circumstances of this case we hold that there was no partnership between Orville and Dean in 1975. Orville, a forthright and credible witness, testified that he never intended to form a partnership with Dean. He wanted to limit his liability only to the amounts he actually expended *528 and he did not want to risk unlimited liability on a project of so great a scale as the newspaper supplement. Dean looked upon the amounts he received from Orville as either a retainer fee or consulting fee, and he fully included all such amounts in his sole proprietorship gross income. Although both written agreements provided for the division of profits between Orville and Dean, this would not by itself be conclusive as to the existence of a valid partnership. Absent proof of a real intent to form a partnership, a profit sharing arrangement will not be considered a partnership for tax purposes. James v. Commissioner, 16 T.C. 930 (1951), affd. 197 F.2d 813 (5th Cir. 1952). This is especially true where, as here, the record shows that Dean and Orville did not agree to share the losses. Place v. Commissioner, 17 T.C. 199, 206 (1951), affd. 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953). In addition to the absence of the proper intent, there was no mutual interest in capital. Place v. Commissioner, supra. *529 The facts herein are similar to those of two appellate cases where the Courts rejected the Commissioner's contentions that such circumstances demonstrate a partnership arrangement. In Friednash v. Commissioner, 209 F.2d 601 (9th Cir. 1954) affg. a Memorandum Opinion of this Court dated Jan. 31, 1952, the taxpayer operated a number of retail liquor stores. His brother had worked for him occasionally in one or another of these establishments. While so employed the brother learned that a restaurant was for sale. The brother urged the taxpayer to buy the property and let him operate it on a partnership basis. The taxpayer was reluctant to do that, but did agree to buy the property and let his brother manage it as an employee at a monthly salary plus 50 percent of the net profits of the business. The taxpayer deducted payments to his brother as employee compensation and the brother treated it correspondingly as wages. The Ninth Circuit, wherein appeal would lie in this case, affirmed our holding that the way in which the taxpayer and his brother functioned was indicative of an employer-employee relationship and not a partnership. [4] In Starr v. Commissioner, 267 F.2d 148 (7th Cir. 1959), *530 the Court of Appeals held that two taxpayers who made advances, to be repaid without interest in three or six years, to a partnership of which two of the four partners were related to the two taxpayers, and each taxpayer was to receive a partner's share, or one-sixth of the partnership profits, at the end of the first three-year period, had entered into a transaction for profit. The Court further held that the arrangement constituted a profit-sharing agreement and that the losses were deductible in full under section 23(e)(2) of the Internal Revenue Code of 1939, the predecessor of section 165(c)(2).
Because of our conclusion herein, we need not address the issues which would have resulted from a finding of the existence of a partnership, such as the proper percentage of the distributive share under section 704, whether there was a special allocation under section 704, or whether there was an election out of subchapter K under section 761. Issue 3. Foreign Income Exclusion
Section 911 provided in pertinent part in 1975: EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES
Sec. 911 (a) *531 GENERAL RULE.--The following items shall not be included in gross income and shall be exempt from taxation under this subtitle: (1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.--In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c). (b) DEFINITION OF EARNED INCOME.--For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, * * * (c) SPECIAL RULES.--For *532 purposes of computing the amount excludable under subsection (a), the following rules shall apply: (1) LIMITATIONS ON AMOUNT OF EXCLUSION.--The amount excluded from the gross income of an individual under subsection (a) for any taxable year shall not exceed an amount which shall be computed on a daily basis at an annual rate of-- (A) except as provided in subparagraph (B), $ 20,000, in the case of an individual who qualifies under subsection (a), or (B) $ 25,000 in the case of an individual who qualifies under subsection (a)(1), but only with respect to that portion of such taxable year occurring after such individual has been a bona fide resident of a foreign country or countries for an uninterrupted period of 3 consecutive years. (2) ATTRIBUTION TO YEAR IN WHICH SERVICES ARE PERFORMED.--For purposes of applying paragraph (1), amounts received shall be considered received in the taxable year in which the services to which the amounts are attributable are performed. On Form 2555 (Exemption of Income Earned Abroad) of his 1975 Federal income tax return, Dean reported earned income from sources outside the United States in the amount of $ 25,762.79. Of this, Dean excluded *533 $ 12,250, or 49 percent of the $ 25,000 exclusion provided under section 911(c)(1)(B), based upon his contention that he was a bona fide resident of Beirut, Lebanon from 1970 until June 28, 1975. Dean's earned income in 1975 resulted from $ 18,000 he received on May 30, 1975 and $ 3,000 he received between August 6 and December 1, 1975, amounts paid while he was physically present in the United States.
The exclusion under section 911(a)(1) is available for income paid from sources located within the United States, as long as the services rendered by a qualified taxpayer for which the compensation is received were performed in a foreign country. Perkins v. Commissioner, 40 T.C. 330, 341 (1963). See also Rev. Rul. 72-423, 1972-2 C.B. 446. The taxpayer must be a bona fide resident of a foreign country for an uninterrupted period which includes an entire taxable year. Additionally, the exemption from tax is applicable to such amounts as are attributable to that portion of an uninterrupted period of bona fide foreign residence which falls within a taxable *534 year during which the taxpayer terminates bona fide foreign residence provided that such period includes at least one entire taxable year. Section 1.911-2(a), Income Tax Regs. However, no amounts received for services performed within the United States are eligible for the exclusion under section 911. Section 1.911-2(c)(4), Income Tax Regs.
Section 911(c)(2) states that the "amounts received shall be considered received in the taxable year in which the services to which the amounts are attributable are performed." [5] Although Dean used the portion of 1975 during which he claims foreign residency status (January 1, 1975 to June 28, 1975) to compute the section 911 exclusion on his 1975 income tax return, [6] at trial and on brief he contends the payments he received were attributable to services all of which were performed in 1974 while he was a bona fide resident of Lebanon for the entire year. *535 Respondent argues that (1) all payments to Dean were for services to be rendered after Dean's arrival in California in March 1975 and as a result the U.S. source compensation is not eligible for the exclusion under section 911, and (2) in any case Dean was not a bona fide resident of Lebanon in 1974 or 1975 and therefore he cannot claim any benefits under section 911. Dean's contention that all the amounts he received were for services performed during 1974 is at variance with the first agreement he and Orville signed. That agreement specifies its term as being from January 1, 1975 to July 1, 1975 and specifies the $ 18,000 amount as being a retainer fee for Dean's representing Orville in business ventures. Until the end of 1974 Dean represented Mr. Morris and was sufficiently funded for all his business expenses. It was not until December of 1974 that Dean felt the need for additional financing and began a search for a new source, his brother Orville. The business relationship between Dean and Orville began in January of 1975 and was memorialized by the written agreement signed in April or May of 1975. Thus, the $ 18,000 consulting fee must be prorated over the 181 day period *536 from January 1, 1975 to July 1, 1975, as follows: for 48 days, from January 1, 1975, to February 17, 1975, Dean performed services abroad; for 133 days, from February 18, 1975, to July 1, 1975, Dean performed services within the United States. Therefore, 73 percent (133 days/181 days) of the $ 18,000, or $ 13,140, was attributable to work performed within the United States, and cannot enter into the section 911 exclusion computation. Section 1.911-2(c)(4), Income Tax Regs.
The balance, $ 4,860, is eligible for the section 911 exclusion computed on the number of qualifying days of foreign residence, but only if Dean was a bona fide resident of Lebanon during the relevant period. The $ 3,000 Dean received between August 6 and December 1, 1975 was clearly for services performed in the United States trying to interest Middle Eastern investors in California real estate projects. This amount also cannot enter into the section 911 exclusion computation. Section 1.911-2(c)(4), Income Tax Regs.
The determination of whether a citizen *537 of the United States is a bona fide resident of a foreign country for purposes of section 911(a)(1) requires an analysis of all relevant facts and circumstances, applying, to the extent feasible, the principles of section 871 and the regulations thereunder which establish a test of residency for alien individuals in the United States. Schoneberger v. Commissioner, 74 T.C. 1016 (1980); Dawson v. Commissioner, 59 T.C. 264, 268 (1972); section 1.911-2(a)(2), Income Tax Regs. The principal distinction to be drawn is that of residents on the one hand, and transients or sojourners on the other. In this regard the intention of the taxpayer respecting the nature and duration of his stay are of paramount importance. Dawson v. Commissioner, supra at 268; section 1.871-2(b), Income Tax Regs.[7] The regulations shed some light on the nature of the intent required. A United States citizen who intends to live in a foreign country indefinitely will be considered a resident. A floating intention to return to another country on some future date will not, by itself, classify him as a transient. *538 The regulations also provide that if a citizen travels to a foreign country to accomplish a specific purpose requiring an extended stay, he may qualify as a resident even though he intends to return to his domicile when his task is completed. It is clear that the citizen need not be domicile in a foreign country, i.e., living there with the intent to make that country his permanent home, in order to be classed as a resident for Federal income tax purposes. Weible v. United States, 244 F.2d 158, 163 (9th Cir. 1957); Commissioner v. Swent, 155 F.2d 513, 515 (4th Cir. 1946), cert. denied, 329 U.S. 801 (1947). Schoneberger v. Commissioner, supra at 1025; Dawson v. Commissioner, supra at 270. *539 On the other hand, it is equally clear that mere physical presence in a foreign country is not sufficient to establish bona fide residency. Downs v. Commissioner, 166 F.2d 504, 508 (9th Cir. 1948), cert. denied 334 U.S. 832 (1948); Constantinescu v. Commissioner, 11 T.C. 37, 43-44 (1948). The legislative history of section 911(a) and its predecessors supports this conclusion. Originally a United States citizen could avail himself of the earned income exclusion by establishing nonresidency in the United States. Section 116(a), Internal Revenue Code of 1939. In 1942 Congress changed the law to require the citizen claiming the exclusion to prove bona fide residency in a foreign country rather than nonresidency in the United States. Then in 1951 Congress, stating that stringent application of the bona fide residency test had worked a hardship on many individuals working overseas, enacted an alternative test which allowed the exclusion based on mere physical presence in a foreign country for a specified period of time. [8] However, it chose not to alleviate the strictness of the bona fide residency test. Thus, we think the statutory *540 history indicates that Congress expected the courts to strictly interpret the meaning of the term "bona fide resident," and physical presence in a foreign country, although obviously a factor to be considered, is by no means determinative. We also note that in establishing bona fide residency the petitioner bears more than the usual burden of proof since section 911(a)(1) requires bona fide residency to be established "to the satisfaction of the Secretary or his delegate." We have recently held that such language requires the citizen to prove the merits of his claim by strong proof. Schoneberger v. Commissioner, supra at 1023. Bearing in mind the Congressional mandates of strict compliance and strong proof, we turn to the problem of determining petitioner's intentions with regard to the length of his stay. Since the taxpayer's professed intent is not determinative in such cases, we must rely primarily on an analysis of certain objective factors which the courts have found to be relevant in past decisions. *541 In Sochurek v. Commissioner, 300 F.2d 34, 38 (7th Cir. 1962), revg. 36 T.C. 131 (1961), the Court listed a number of factors [9] culled from prior case law which we subsequently accepted and applied in Dawson v. Commissioner, 59 T.C. at 268. See also Schoneberger v. Commissioner, 74 T.C. at 1026-29. After applying those factors to the facts and circumstances of the present case, we hold that Dean has established by strong proof that he was a bona fide resident of Lebanon from September 1970 until June 28, 1975. *542 Dean, Pauline and their two children moved to Lebanon in 1970. At that time they intended to make Lebanon their home. Pauline had been born a citizen of Lebanon and lived there until she was twenty-three years old. Her father and mother were well-known among Beirut society and the business and professional community. Pauline was personally acquainted with the President and the Prime Minister of Lebanon and a number of Deputies of Parliament. She spoke Arabic and French, the official and second language of Lebanon, respectively. Dean's children went to Lebanese schools and were fully assimilated into the culture. Since evidence of integration into the foreign society is highly probative of an intent to remain in the foreign country indefinitely, if not permanently, the courts have tended to place considerable reliance on such evidence. See, e.g., Schoneberger v. Commissioner, 74 T.C. at 1026; Dawson v. Commissioner, 59 T.C. at 269; Benfer v. Commissioner, 45 T.C. 277, 292 (1965); Scott v. United States, 193 Ct. Cl. 27, 42, 432 F.2d 1388, 1397-1398 (1970). Dean lived with his family and in-laws in Beirut *543 and traveled widely throughout the Middle East in pursuit of his business interests there. Dean was physically present in Lebanon whenever his business pursuits did not require him to be elsewhere. Under Lebanon law he was not required to pay taxes to Lebanon. When he returned to the United States in February of 1975, his purpose here was to promote his Peace in the Middle East newspaper supplement project. He fully expected to return to Beirut as soon as he accomplished his task. Dean and his family had no established home in the United States between September 1970 and June 1975. Dean sometimes stayed with relatives on visits and business trips to the United States. Respondent points out that Dean had only a renewable visa and not a permanent visa all the time he as in Lebanon. We have held, however, that immigration laws are not conclusive of the issue of residency for Federal tax purposes and that nominal restrictions are of little weight, particularly when dealing with foreign law. Schoneberger v. Commissioner, supra, at 1027; Brittingham v. Commissioner, 66 T.C. 373, 414 (1976), *544 affd. on another issue 598 F.2d 1375 (5th Cir. 1979); Constantinescu v. Commissioner, 11 T.C. 37, 42-44 (1948). Although sometime in April it became apparent that it would be safer for Pauline and the children to leave Lebanon, we do not think Dean's foreign residency was changed until his family actually left Lebanon and arrived in the United States, on June 28, 1975. [10] Pauline testified that when the civil disturbances began in April of 1975, she did not know whether they would stop the next day or not. Had the fighting stopped, we think Dean would have returned to Lebanon to continue his business interests in the Middle East. *545 Accordingly, we hold on these facts that Dean has established by strong proof that he was a bona fide resident of Lebanon from September 1970 until June 28, 1975. Therefore, the $ 4,860 he received which is allocable to the services he performed abroad in 1975 is eligible for the section 911 exclusion computed on a daily basis from January 1, 1975 until June 28, 1975. To reflect the concessions made by the parties and our conclusions with respect to the disputed issues, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year at issue, unless otherwise indicated.↩
2. Petitioner Orville E. Duley signs his name Gene Duley.↩
3. Section 911(c)(1)(B) provides the amount excluded from the gross income of a bona fide resident of a foreign country for any taxable year shall not exceed an amount which shall be computed on a daily basis at an annual rate of $ 25,000 with respect to that portion of the taxable year occurring after he has been a bona fide resident for an uninterrupted period of 3 consecutive years. By claiming foreign bona fide residency for 3 consecutive years status, Dean computed his foreign income exclusion for the year 1975 by counting the number of days between January 1, 1975 and June 28, 1975, taking this figure, 179 days, and dividing it by the number of days in the year, to arrive at a result of 49 percent. He then multiplied $ 25,000 by 49 percent to obtain the exclusion prorated on a daily basis of $ 12,250. For the method of computation used in 1975 see generally section 1.911-2(a), Income Tax Regs.↩
4. See also Minckler v. Commissioner, T.C. Memo. 1962-122↩.
5. The amounts are reflected in Dean's 1975 income tax return because the eligibility under section 911 does not affect the time of reporting of any amounts which are includible in an individual's gross income. Section 1.911-2(d)(1)(ii), Income Tax Regs.↩
6. See footnote 3, supra↩.
7. Sec. 1.871-2(b), Income Tax Regs., provides as follows: RESIDENCE DEFINED. An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.↩
8. See S. Rept. No. 781, 82d Cong., 1st Sess., p. 53 (1951), 1951-2 C.B. 458, 495 pertaining to the forerunner of section 911(a)(2)↩.
9. The Court stated as follows (300 F.2d at 38): Among the factors considered by the courts in determining whether a citizen of the United States has discharged his burden of satisfactorily establishing his claim of bona fide residence in a foreign country during an entire taxable year are the following: (1) intention of the taxpayer; (2) establishment of his home temporarily in the foreign country for an indefinite period; (3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment; (4) physical presence in the foreign country consistent with his employment; (5) nature, extent and reasons for temporary absences from his temporary foreign home; (6) assumption of economic burdens and payment of taxes to the foreign country; (7) status of resident contrasted to that of transient or sojourner; (8) treatment accorded his income tax status by his employer; (9) marital status and residence of his family; (10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time; (11) good faith in making his trip abroad; whether for purpose of tax evasion. While all such factors may not be present in every situation, those appropriate should be properly considered and weighed.↩
10. In 1980 Congress expressed its concern over the possible loss of bona fide foreign residency by U.S. citizens who were forced to flee a foreign country because of war or civil unrest. See Pub.L. 96-608, § 1(a), 94 Stat. 3550 (Dec. 28, 1980) which added section 913(j)(4); H.Rept. No. 96-689 (Dec. 5, 1979); S. Rept. No. 96-1031 (Nov. 24, 1980); Internal Revenue News Release IR -81-34 (Mar. 20, 1981). Section 913(j)(4), which permits a waiver of the period of stay in a foreign country because of war or civil unrest, applies only to tax years beginning after December 31, 1977, and therefore does not apply to the tax year 1975. The tax laws affecting income earned abroad were substantially changed subsequent to year in issue. See Foreign Earned Income Act of 1978, Pub.L. 95-615, 92 Stat. 3098.↩