T.C. Memo. 2019-135

UNITED STATES TAX COURT

JOSEPH S. BELLWOOD AND JACQUELINE E. BELLWOOD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13226-17.                    Filed October 7, 2019.

    In 2013, 2014, and 2015, P-H flew helicopters in Saudi Arabia
for a U.S. company that provided air ambulance services for the Saudi
Red Crescent Authority.  P-H worked in Saudi Arabia on a repeating
"28 & 28" schedule, meaning 28 days on duty followed by 28 days
off duty.  During the 28 days on duty, P-H lived in Saudi Arabia and
resided in employer-provided housing when he was not otherwise
working.  During the 28 days off duty, P-H traveled to the United
States and resided in his own home in Georgia with P-W and their
youngest son.  During 2013, 2014, and 2015, P-H retained his U.S.
citizenship, driver's license, voter registration, bank account, and
healthcare in the United States.

    For 2013, 2014, and 2015, P-H used tax preparation software to
complete the couple's tax returns, and on each return they claimed a
"foreign earned income" exclusion ("FEIE") under I.R.C. sec. 911(a)
for the income P-H earned while working in Saudi Arabia.  The
returns also claimed deductions for 2013, 2014, and 2015 for

[*2] unreimbursed employment expenses related to P-H's work in Saudi Arabia.

Upon examination of Ps' returns, R disallowed the FEIEs and the deductions for unreimbursed employment expenses, and R determined a tax deficiency against Ps for each of 2013, 2014, and 2015. Additionally, R determined an accuracy-related penalty against Ps for each year.

Held: For 2013, 2014, and 2015, P-H was not a "qualified individual" for purposes of the FEIE because Ps failed to show that P-H's "abode" was not "within the United States" and that he was a "bona fide resident" of Saudi Arabia for purposes of I.R.C. sec. 911(d)(1)(A).

Held, further, Ps failed to substantiate unreimbursed employment expenses underlying deductions that they claimed for 2013, 2014, and 2015 and thus are not entitled to such deductions.

Held, further, Ps failed to show reasonable cause for their substantial understatements of income tax and are thus liable for accuracy-related penalties under I.R.C. sec. 6662(a) for 2013, 2014, and 2015.

Joseph S. Bellwood and Jacqueline E. Bellwood, for themselves.

Erika B. Cormier, for respondent.

[*3]     MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, Judge:  Pursuant to section 6212(a),[1] on March 14, 2017, the Internal Revenue Service ("IRS") issued to petitioners, Joseph S. Bellwood and Jacqueline E. Bellwood, a notice of deficiency, which determined the following deficiencies in tax and accuracy-related penalties under section 6662(a):

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|---------------------|
| 2013 | $16,225 | $3,245 |
| 2014 | 22,650 | 4,530 |
| 2015 | 26,597 | 5,319 |

Mr. and Mrs. Bellwood timely filed a petition under section 6213(a) for redetermination of the deficiencies and the penalties.

The issues that remain for decision[2] are:  (1) whether for 2013, 2014, or 2015, Mr. Bellwood was a "qualified individual" for purposes of the foreign

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (26 U.S.C.) as amended and in effect for the relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts are rounded to the nearest dollar.

[2]The Commissioner also determined that the Bellwoods had unreported income of $766 for 2014 and $8,314 for 2015; however, the Bellwoods conceded the $766 adjustment for 2014, and the Commissioner conceded the $8,314 adjustment for 2015.

[*4] earned income exclusion ("FEIE") of section 911 (we hold that he was not); (2) whether the Bellwoods were entitled to deduct unreimbursed employment expenses for 2013, 2014, or 2015 (we hold that they were not); and (3) whether the Bellwoods are liable for accuracy-related penalties for their 2013, 2014, and 2015 returns (we hold that the Bellwoods are liable for such penalties).

FINDINGS OF FACT

Mr. Bellwood is a U.S. citizen.  He was born in Maine, and his parents continue to live there.  In 1987 he joined the U.S. Army and served his country as a helicopter pilot for 22 years before retiring in 2009.  When he retired, Mr. Bellwood returned to Maine where he lived with his wife, Mrs. Bellwood, and their youngest son, who was an avid tennis player.  (The Bellwoods have an older son who lived in New Jersey, but it is unclear when he moved to New Jersey or whether he lived with his parents in Maine in 2009.)  In 2012 Mr. Bellwood received an offer from a U.S. company, PHI, Inc. ("PHI"), to fly helicopters on assignment in Ha'il, Saudi Arabia.  Mr. Bellwood accepted the offer, and at some point before his departure in 2013, Mr. and Mrs. Bellwood moved from Maine to Georgia, where they believed their young son would have better opportunities to develop as a tennis player.  From 2013 through 2015, Mrs. Bellwood and their

**[*5]** young son lived in the family's home in Georgia while Mr. Bellwood traveled between Georgia and Saudi Arabia for work.

Mr. Bellwood's employment arrangements with PHI

The offer letter from PHI stated that Mr. Bellwood's initial start date would be March 14, 2012, and that he would be employed in the United States at 50% pay until he was ultimately deployed to Saudi Arabia. Mr. Bellwood testified that during the initial stages of his employment with PHI in 2012, he was kept on retainer in the United States at a reduced rate of pay while PHI secured contracts for work in Saudi Arabia. Once the contracts were secured, presumably sometime in 2012, PHI nominally transferred Mr. Bellwood to Ha'il, Saudi Arabia, effective December 31, 2012, though Mr. Bellwood did not actually depart for Saudi Arabia until January 18, 2013.

As stated in PHI's offer letter, Mr. Bellwood was contracted to work on a repeating "28 & 28 schedule"--meaning approximately 28 days on duty followed by 28 days off duty, subject to variation according to PHI's needs. In addition, the offer letter informed Mr. Bellwood of PHI's intent to repatriate him to the United States in the event that his assignment in Saudi Arabia ended, which happened sometime in 2016. Nevertheless, from 2013 through 2015, Mr. Bellwood was a full-time employee, based out of Saudi Arabia. During his employment

**[\*6]** Mr. Bellwood would travel to Saudi Arabia for his 28 days on duty, and then he would return to his home in Georgia where he would spend his 28 days off duty. He repeated this process with little variation from January 2013 through December 2015 (though there was a stint in early 2015 in which his work and travel were limited because of illness). During his days on duty, Mr. Bellwood did not leave Saudi Arabia; and during his days off duty, he did not stay in Saudi Arabia.

Mr. Bellwood's housing in Saudi Arabia

When Mr. Bellwood was in Saudi Arabia, he lived in housing provided by PHI. From January 18, 2013, until sometime in February 2014, PHI provided Mr. Bellwood with a dedicated hotel room where he stayed when he was in Saudi Arabia and where he left his belongings when he returned to the United States. Sometime in February 2014, PHI constructed a compound with "efficiency apartments" in which Mr. Bellwood and other employees stayed while they were in Saudi Arabia. The compound consisted of 14 single-story efficiency apartments in a U-shape around a pool and was surrounded by a 15-foot-high wall with a gated entrance. Mr. Bellwood testified that the apartments were furnished for the employees and that, except for minor things such as a toaster oven, he did not purchase anything for his apartment. Mr. Bellwood stayed in the same apartment

[*7] each time he returned to Saudi Arabia during the remainder of 2014 and during 2015, and he left his belongings in the apartment each time he left Saudi Arabia.

Mr. Bellwood's social activities in Saudi Arabia

Although PHI's employees lived in a gated compound, they were free to travel outside the compound. Mr. Bellwood testified that his activities in Saudi Arabia included traveling to the grocery, eating at local restaurants in the city, visiting a barber when needed, and socializing with the locals from time to time. He was prohibited from participating in civic activities because he was not a citizen.

Mr. Bellwood's retained connections to the United States

During 2013, 2014, and 2015, Mr. and Mrs. Bellwood continued to own their home in Georgia where Mrs. Bellwood lived with their youngest son; during that same time, their older son lived in New Jersey, and Mr. Bellwood's parents lived in Maine. Mr. Bellwood obtained a driver's license and registered his vehicle in Georgia; he retained his U.S. citizenship and registered to vote in Georgia; and he sought medical care each year while he was in Georgia, which we infer included January through March 2015, when he was too ill to work in Saudi Arabia. Mr. Bellwood's sole bank account was through a credit union in Maine,

**[*8]** and he generally conducted his affairs indirectly through his Georgia address while he was in Saudi Arabia or directly while in Georgia during his days off duty. Mr. Bellwood was unable to receive mail or make phone calls while he was in Saudi Arabia, and he continually used his Georgia address as his mailing address.

Mr. Bellwood's time spent in the United States and Saudi Arabia

Mr. Bellwood was in Saudi Arabia for work on approximately 204 days in 2013, 210 days in 2014, and 161 days in 2015. He generally worked 12-hour shifts; and because of the demanding nature of his work, he spent most of his off-duty time either resting or preparing for the next shift. During those same years, Mr. Bellwood was in the United States on his days off on approximately 167 days in 2013, 152 days in 2014, and 209 days in 2015.[3] When in the United States, he spent time with his family or on hobbies (which he could not do in Saudi Arabia); he tended to his healthcare; and, presumably, he spent some time at the end of each off-duty period preparing to return to work.

---

[3]The parties stipulated a schedule of days that Mr. Bellwood spent in the United States or Saudi Arabia in each year. For some days, he evidently spent part of the day in both countries, and such a day is double-counted as both one day in the United States and one day in Saudi Arabia. For one year (2014), a few days are not accounted for. As a result the parties have effectively stipulated that Mr. Bellwood's 2013 year included 371 days, his 2014 year included 362 days, and his 2015 year included 370 days. We do not attempt to correct these numbers or to reconcile them to a 365-day year.

[*9] Tax returns and notice of deficiency

    A.  TurboTax and Form 2555

The Bellwoods timely filed Forms 1040, "U.S. Individual Income Tax Return", for 2013, 2014, and 2015. Mr. Bellwood testified that he used TurboTax software each year to help him prepare the returns and that each year the software guided him to claim the FEIEs for the income he earned working in Saudi Arabia. The Bellwoods attached Forms 2555, "Foreign Earned Income", to each return.

On the Form 2555 for 2013,[4] Mr. Bellwood completed Part I of the form and provided general information including: his foreign address in Ha'il, Saudi Arabia; the fact that his employer was a U.S. company; and the fact that he was a U.S. citizen. However, in the portion of Part I that directs a taxpayer to list his or her "tax home(s)" and "date(s) established", Mr. Bellwood listed "Maine", established on "01- 01- 2013", and he did not list either Saudi Arabia or Georgia as a tax home. Under Part II of the Form 2555, Mr. Bellwood stated that his foreign residence began "01-01-2013" and "CONTINUE[D]"; he listed various dates that he was present in the United States during 2013 (though those dates

---

    [4]The Form 2555 is structured so that the taxpayer will complete Part I, "General Information", and then either Part II, "Taxpayers Qualifying Under Bona Fide Residence Test", or Part III, "Taxpayers Qualifying Under Physical Presence Test"; the remaining Parts IV-IX direct the qualifying taxpayer in the calculation of the FEIE.

**[\*10]** were inconsistent with an August 2016 schedule he later prepared and submitted to the IRS); he checked boxes indicating he was employed abroad and entered the foreign country under a work visa and that the visa limited his stay in the foreign country (though he did not provide the requested "explanation" as to the nature of the limitation); and he checked the box to indicate he maintained a home in the United States while living abroad though he did not provide the requested "explanation" regarding the home (for example, the address, whether it was rented, the names of any occupants, and their relationship to Mr. Bellwood). After providing the general information in Part I and the qualifying information in Part II, Mr. Bellwood's Form 2555 proceeds with his calculation of the FEIE for 2013, which he determined to be $77,650[5] and reported as negative income on line 21 of the Bellwoods' Form 1040.

On the Form 2555 for 2014, Mr. Bellwood completed Part I of the form in a similar manner as in the prior year, stating that his tax home was "Maine" but giving an established date of "01-01-2014" and again failing to list Georgia or Saudi Arabia as a tax home. For 2014, however, Mr. Bellwood did not complete

---

[5]The calculation began with Mr. Bellwood's foreign earned income for 2013 ($162,748), which would have allowed a maximum FEIE of $97,600 (i.e., the cap for 2013); however, the Bellwoods reduced the $97,600 amount by $19,950 for "[u]npaid per diem" deductions that they would later claim under Schedule A, "Itemized Deductions", of their return.

**[*11]** Part II of the form but instead completed Part III, for the "Physical Presence Test" (rather than Part II for the "Bona Fide Residence Test"). Under Part III Mr. Bellwood listed Saudi Arabia as his principal country of employment during that period; and he provided "01-01-2014" through "12-31-2014" as the supposed period of his "physical presence" in Saudi Arabia; but he then included a data table stating that he was physically present in the United States on 147 full days during 2014 (and therefore present in Saudi Arabia for no more than 218 days), whereas the physical presence test of section 911(d)(1)(B) requires taxpayers to be present in the foreign country for 330 full days in a 12-month period. Under Parts IV-IX, Mr. Bellwood calculated his FEIE for 2014 to be $99,200[6] (the maximum for that year), and he reported that amount as negative income on line 21 of the Bellwoods' Form 1040.

On the Form 2555 for 2015, Mr. Bellwood reported in Part I, as in the prior years: that his foreign address was in Ha'il, Saudi Arabia; that his employer was a U.S. company; and that he was a U.S. citizen. Again he listed "Maine" as his tax home, but he changed the date established to "08-03-2012"; and again he did not list Saudi Arabia or Georgia as a tax home. As in 2013 he claimed the FEIE under Part II (for the "Bona Fide Residence Test") and stated that his bona fide residence

---

[6]The Bellwoods did not reduce the FEIE for any unpaid per diem in 2014.

[*12] began "08-03-2012" and "CONTINUE[D]". Mr. Bellwood listed dates of his presence in the United States from January through December of 2015; however, those dates appear inconsistent with his expense reimbursement vouchers from PHI, and his August 2016 schedule indicated that illness prevented his presence in Saudi Arabia until March 2015. As in 2014 Mr. Bellwood claimed the maximum FEIE ($100,800 for 2015) and reported that amount as negative income on the Bellwoods' Form 1040.

B. Unreimbursed employment expenses

PHI paid Mr. Bellwood a $50 per diem for expenses, which he did not report as income (and which is not at issue here). However, Mr. Bellwood believed that the U.S. State Department paid its employees in Saudi Arabia a larger per diem of $155. He considered the $105 difference to constitute "unpaid per diem" in his case, and on his return he deducted that amount as an unreimbursed employment expense. That is, Mr. Bellwood apparently presumed that he had incurred the same expenses that a State Department employee would have incurred but reckoned that in his case those expenses were unreimbursed to the extent of the "unpaid" $105 per day. This resulted in Mr. Bellwood's claiming

[*13] unreimbursed employment expenses of $19,950 for 2013; $22,785 for 2014; and $25,042 for 2015.[7]

C. Notice of deficiency

On March 14, 2017, the IRS issued Mr. and Mrs. Bellwood the notice of deficiency for 2013, 2014, and 2015. For each year the IRS determined an underpayment of tax and an accuracy-related penalty under section 6662(a); and three months earlier that penalty determination had been personally approved in writing by the supervisor's signing a "Civil Penalty Approval Form" on December 6, 2016. Mr. and Mrs. Bellwood timely petitioned this Court on June 12, 2017. At that time, they resided in Georgia.

OPINION

I. Burden of proof

In general, an IRS notice of deficiency is presumed correct, "and the petitioner has the burden of proving it to be wrong". Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Rule 142(a). Moreover, with respect to the "bona

---

[7]The amounts Mr. Bellwood reported as unreimbursed employment expenses are not consistent with the number of days he spent in Saudi Arabia according to the August 2016 schedule that the parties stipulated. For example, the $19,950 that he reported for 2013, if divided by $105, yields 190 days spent in Saudi Arabia in 2013 rather than the 204 days indicated on his August 2016 schedule. This discrepancy does not affect the outcome of this case, so we do not attempt to resolve it. We accept the parties' stipulation.

[*14] fide residence" issue discussed below in part IV, the Bellwoods bear a somewhat higher burden than mere preponderance of the evidence. A taxpayer who qualifies under section 911(d)(1)(A) is not simply someone who "proves" that he has been a bona fide resident of a foreign country but rather is someone who "establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country". (Emphasis added.) We have construed this statutory phrase to set a higher-than-ordinary standard of proof--i.e., "strong proof"--of bona fide resident status in a foreign country, Schoneberger v. Commissioner, 74 T.C. 1016, 1024 (1980), which is not as high a standard as "beyond reasonable doubt" but is higher than preponderance of the evidence.

II.    Basic principles of the FEIE

Section 61(a) provides the following broad definition of the term "gross income": "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived". However, section 911(a) provides that a "qualified individual" may elect to exclude from gross income his "foreign earned income". To qualify for the FEIE, the taxpayer must satisfy three conditions, the first two of which, if satisfied, render the taxpayer a "qualified individual", and the third of which relates to the type of income the taxpayer receives:

[*15] (1)     The taxpayer's "tax home" for the period must be "in a foreign country".  Sec. 911(d)(1).

(2)     The taxpayer must be (a) a U.S. citizen who is "a bona fide resident of a foreign country * * * for * * * an entire taxable year", sec. 911(d)(1)(A), or (b) a U.S. citizen or resident who is "present in a foreign country or countries during at least 330 full days" of a 12-month period, sec. 911(d)(1)(B).  And--

(3)     The taxpayer must have "foreign earned income"--i.e., income earned from personal services rendered in a foreign country.  Sec. 911(a)(1), (b)(1)(A), (d)(2).

The Commissioner does not dispute that the compensation Mr. Bellwood received for flying helicopters in Saudi Arabia was "foreign earned income", and consequently we assume that it was.  Thus, if during 2013, 2014, and 2015 Mr. Bellwood met the first two conditions listed above and was therefore a "qualified individual" for purposes of section 911, then he was entitled to exclude a portion of the compensation he received from PHI from gross income for those years.  The undisputed facts show that Mr. Bellwood was not "present in a foreign country or countries during at least 330 full days" of any 12-month period during the years at issue but was instead, under his repeating "28 & 28 schedule", present

[*16] in the United States for more than 150 full days during each year in issue, so the 330-day test of section 911(d)(1)(B) is not satisfied in this case.

Consequently, the Bellwoods first must show--by a preponderance of evidence--that Mr. Bellwood's "tax home" was in a foreign country, within the meaning of section 911(d)(1);[8] and second, they bear the increased burden of giving "strong proof" that he was a "bona fide resident", within the meaning of section 911(d)(1)(A), of one or more foreign countries for an uninterrupted period including a full taxable year. These two requirements call for overlapping inquiries, but we address each in turn.

III.    "Tax home" and "abode"

Under section 911(d)(1) the FEIE is available only to an individual "whose tax home is in a foreign country". Section 911(d)(3) defines the term "tax home" as "[an] individual's home for purposes of section 162(a)(2) (relating to traveling expenses while away from home)", which is typically considered to be the location of the individual's principal place of business, Harrington v. Commissioner, 93 T.C. 297, 307 (1989), and, of course, Saudi Arabia was Mr. Bellwood's principal

---

[8]"[T]he taxpayer must present 'strong proof' that he was a bona fide resident of a foreign country, whereas he need only establish that his tax home was in a foreign country by a preponderance of evidence." Ritchie v. Commissioner, T.C. Memo. 1989-426, 1989 Tax Ct. Memo LEXIS 424, at *25.

[*17] place of business. However, section 911(d)(3) further provides: "An individual shall not be treated as having a tax home in a foreign country for any period for which his <u>abode</u> is within the United States." (Emphasis added.) Consequently, if Mr. Bellwood's "abode" was in the United States during the years in issue, he does not satisfy the "tax home" requirement of section 911(d)(1), notwithstanding that Saudi Arabia was his principal place of business. Section 911(d)(3) does not define the term "abode", so we look to other authorities for a definition.

One's "abode" is where he "abides". <u>Acone v. Commissioner</u>, T.C. Memo. 2017-162, at *12. However, an individual's abode cannot be determined by simply identifying the location where he spent the greatest number of days during a given period, especially if a location where he spent fewer days was his family home where he spent those days with his wife and youngest son. This Court and at least one Court of Appeals have recognized a domestic-vs.-vocational distinction for determining one's "abode" under section 911:

> "Abode" has been variously defined as one's home, habitation, residence, domicile, or place of dwelling. Black's Law Dictionary 7 (5th ed. 1979). While an exact definition of "abode" depends upon the context in which the word is used, it clearly does not mean one's principal place of business. Thus, "abode" has a domestic rather than vocational meaning, and stands in contrast to "tax home" as defined for purposes of section 162(a)(2).

[*18] Bujol v. Commissioner, T.C. Memo. 1987-230, 1987 Tax Ct. Memo LEXIS 234, at *8-*9, aff'd without published opinion, 842 F.2d 328 (5th Cir. 1988), cited with approval in Lemay v. Commissioner, 837 F.2d 681, 683-684 (5th Cir. 1988), aff'g T.C. Memo. 1987-256. Consequently, when one of the locations with which an individual is connected is in the United States (e.g., when during the relevant periods the taxpayer owns a home in the United States and spends numerous days at that home, and when the taxpayer's spouse and youngest child live at that home during the relevant periods), we consider the domestic or vocational nature of the time spent in each location in addition to counting the number of days. Accordingly, we compare the domestic and vocational qualities of Mr. Bellwood's respective dwellings, and the time he spent at each, to help determine whether his "abode" remained in the United States.

Mr. Bellwood owned a home in Georgia where he resided during his days off duty in 2013, 2014, and 2015. When working in Saudi Arabia, Mr. Bellwood stayed in a hotel room during 2013 and in an efficiency apartment during 2014 and 2015 neither of which he owned and both of which were provided by his employer. "Maintenance of a dwelling in the United States" does not necessarily establish one's abode here, even if "that dwelling is used by the individual's spouse and dependents", 26 C.F.R. sec. 1.911-2(b), Income Tax Regs., nor does

[*19] staying in a hotel room or an efficiency apartment necessarily disqualify an individual from establishing his abode in a foreign country. Nevertheless, we do not overlook the domestic or vocational qualities of those dwellings; and it is clear that Mr. Bellwood's stronger domestic connection was with the Georgia house and not the Saudi Arabian hotel and apartment.

During the time Mr. Bellwood spent in Saudi Arabia, his regular activities were primarily vocational. Mr. Bellwood testified that his non-work-related activities in Saudi Arabia were limited because of the demanding nature of his work--he went to the barber or grocery store as needed and visited the occasional restaurant, but most of his time in Saudi Arabia was spent either working or resting and preparing for his next shift. That is true, but only because when Mr. Bellwood had spare time, he did not wish to spend it in Saudi Arabia. Rather, during his days off duty, Mr. Bellwood returned to his home in the United States where he spent time with his family, pursued his hobbies, and managed the day-to-day affairs of his personal life. In Georgia he maintained his registration to vote, received his mail, updated his driver's license, and registered his vehicle. Thus, the nature of Mr. Bellwood's respective dwellings and the manner in which he spent his time at each indicate that his "abode" was in the United States, and that he traveled to Saudi Arabia for work only.

[*20] The strength of a taxpayer's ties to the United States may further indicate whether his or her "abode" remains in the United States, especially when the taxpayer's ties to a foreign country are transitory or limited. Harrington v. Commissioner, 93 T.C. at 308. When we compare the ties Mr. Bellwood retained in the United States against his ties to Saudi Arabia, we are further convinced that his "abode" was in the United States. As we have noted, Mr. Bellwood retained his U.S. citizenship. In Georgia Mr. Bellwood owned a home where his wife and young son lived; he retained his voter's registration, vehicle registration, and driver's license; he retained his doctor, dentist, and pharmacist. His mailing address was in Georgia; his only bank account was in Maine; and his oldest son and parents remained in the United States. In contrast, Mr. Bellwood's only ties to Saudi Arabia were his contract for employment with PHI and a toaster oven that he purchased for his apartment.

Even though we accept his testimony that he made friends in Saudi Arabia and visited local shops and restaurants on occasion, Mr. Bellwood failed to establish the significance of any tie to Saudi Arabia beyond his contract with PHI. As for that contract, the significance of this tie is weakened because, first, the contract was contingent upon Mr. Bellwood's retaining professional licenses in the United States and, second, PHI stated that in the event Mr. Bellwood was no

[*21] longer assigned to Saudi Arabia, PHI intended to repatriate him to the United States and reassign him elsewhere (which ultimately happened in 2016). Thus, significant ties that Mr. Bellwood retained in the United States, when compared to the relative lack of such ties to Saudi Arabia, indicate that Mr. Bellwood's "abode" remained in the United States during 2013, 2014, and 2015.

On the basis of the foregoing, we conclude that the Bellwoods fail to satisfy the "tax home" requirement and are thus unable to claim the FEIE for any of the relevant years. Although our FEIE discussion could end here, we now proceed to discuss bona fide residence in part IV.

IV.   Bona fide residence

Whether an individual has taken up bona fide residence in a foreign country depends on the facts and circumstances of the case. The factors that courts have considered in analyzing those facts and circumstances include the following:

> (1)   intention of the taxpayer;
> (2)   establishment of his home temporarily in the foreign country for an indefinite period;
> (3)   participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment;
> (4)   physical presence in the foreign country consistent with his employment;
> (5)   nature, extent and reasons for temporary absences from his temporary foreign home;

[*22]    (6)    assumption of economic burdens and payment of taxes to the foreign country;
    (7)    status of resident contrasted to that of transient or sojourner;
    (8)    treatment accorded his income tax status by his employer;
    (9)    marital status and residence of his family;
    (10)    nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time;
    (11)    good faith in making his trip abroad; whether for purpose of tax evasion.

Sochurek v. Commissioner, 300 F.2d 34, 38 (7th Cir. 1962), rev'g and remanding 36 T.C. 131 (1961). This Court consults those "Sochurek factors" in determining bona fide resident status, see Estate of Sanders v. Commissioner, 144 T.C. 63, 82-83 (2015), vacated and remanded on other grounds, 834 F.3d 1269 (11th Cir. 2016); Schoneberger v. Commissioner, 74 T.C. at 1023, and we consider them now.

    1.    Intention. The Court of Appeals in Jones v. Commissioner, 927 F.2d 849, 854 (5th Cir. 1991), rev'g T.C. Memo. 1989-616, noted that "intent plays perhaps the most important part in determining the establishment and maintenance of a foreign residence". We take as sincere Mr. Bellwood's testimony that he intended to "remain employed in Saudi Arabia", but the relevant intention for which we look is, of course, not merely the intention to be employed in a foreign

[*23] country. Rather, we look for objective indicia of an intention to actually establish residence in the foreign country. In Jones the taxpayer voluntarily declined a residency payment from the State of Alaska, and the court found this to be a sufficient demonstration of the taxpayer's objective intent to establish his residence in a foreign country. Id. We have also held that evidence of "specific, contemporaneous documentation" of a "permanent transfer" for a "sufficiently substantial period of time" can persuade this Court that a taxpayer intended to be a resident of a foreign country. Cobb v. Commissioner, T.C. Memo. 1991-376, 1991 Tax Ct. Memo LEXIS 420, at *16.

Mr. Bellwood presented no evidence that his situation in Saudi Arabia ever involved an objective consequence remotely equivalent to declining a residency payment as in Jones, nor are we convinced that Mr. Bellwood's assignment was akin to a "permanent transfer" for a "sufficiently substantial period of time" as in Cobb. Admittedly, Mr. Bellwood was a "full-time" helicopter pilot for PHI and was "based in the Kingdom of Saudi Arabia". However, we are unconvinced that his assignment was indeed "permanent" or for a "sufficiently substantial period of time" to reflect an intention to become a resident of Saudi Arabia. The offer letter from PHI first refers to Mr. Bellwood as being assigned in the United States during an introductory period and that he would be "reassign[ed] to Saudi Arabia";

[*24] the letter then describes various contingencies that could terminate Mr. Bellwood's employment; the letter then states that "[i]t is PHI's intention to repatriate * * * [Mr. Bellwood] in the event that * * * [he is] no longer assigned to Saudi Arabia". (Mr. Bellwood's testimony suggests that such a repatriation ultimately occurred sometime in 2016.) This factor of intention is adverse to Mr. Bellwood.

2. <u>Establishment of home</u>. Mr. Bellwood did not establish a home in Saudi Arabia for any period, let alone an indefinite one. Mr. Bellwood stayed in whatever accommodations PHI provided him during his 28-day stints on duty in Saudi Arabia, and he moved from one accommodation (a hotel room) to another (an efficiency apartment) at PHI's direction. Although he left belongings in the accommodations during his off-duty periods--when he returned to his house in Georgia--we are not persuaded that such accommodations could be considered "establishment of his home" for purposes of bona fide residence. This factor is adverse to Mr. Bellwood.

3. <u>Activities and assimilation</u>. Mr. Bellwood testified that he made friends in Saudi Arabia and that he traveled around Ha'il where he worked. He visited the barber as needed and traveled about the city for various tasks between his 12-hour work shifts. However, Mr. Bellwood also testified that because of the

[*25] demanding nature of his work, most of his time off duty was spent resting or preparing for his next shift. Ultimately, the record does not establish that Mr. Bellwood participated in activities or attempted to assimilate the local culture in a manner that would indicate bone fide residence. Thus, this factor is adverse to Mr. Bellwood.

4. <u>Physical presence consistent with employment</u>. Although the exact numbers are unclear, the record indicates that Mr. Bellwood was physically present in Saudi Arabia on approximately 204 days during 2013, 210 days during 2014, and 161 days during 2015; and he was physically present in the United States on approximately 167 days in 2013, 152 days in 2014, and 209 days in 2015 (noting that he testified to spending most of the first three months of 2015 in the United States because of illness). "The phrase 'consistent with his employment' should excuse an employment-related absence from the country of supposed residence; it should not * * * set the limit on his presence in the foreign country." <u>Acone v. Commissioner</u>, at *18. By the numbers, Mr. Bellwood spent more days in Saudi Arabia during 2013 and 2014, but he did not appear to spend any of his off-duty days there. In other words, Mr. Bellwood was in Saudi Arabia when work required him to be there, but he was in the United States whenever he could be there. This factor is adverse to Mr. Bellwood.

**[\*26]** 5.  <u>Temporary absences</u>.  The "nature, extent and reasons for \* \* \* [Mr. Bellwood's] temporary absences from" Saudi Arabia are adverse to his claim of bona fide resident status.  Mr. Bellwood spent all of his off-duty days in, or in transit to, the United States.  Although Mr. Bellwood did not provide any evidence showing that some of the days in the United States were spent in connection with his work, e.g., maintaining his pilot's license, etc., the Court presumes this to be true; nevertheless, such days would be minimal in comparison to the number of days spent in the United States off duty.  As Mr. Bellwood testified, there is nothing in the FEIE requirements that would prohibit a taxpayer from leaving his or her foreign country "for brief or temporary trips back to the United States for vacation or business", but Mr. Bellwood has failed to show such trips were either "brief or temporary".  Indeed, he spent more than one-third of each year in the United States, and for roughly 28 days at a time.  This factor is adverse to Mr. Bellwood.

6.  <u>Economic burdens and taxes</u>.  Mr. Bellwood appears to have assumed few economic burdens and has paid no tax in Saudi Arabia.  His employer provided his lodging and reimbursed him $50 for each day he spent in Saudi Arabia.  Mr. Bellwood offered no evidence to show the cost of any meals that he paid for while in Saudi Arabia, and he certainly did not show that PHI's per diem

[*27] did not cover most if not all of such expenses. Rather, he testified that the location was a "third-world country", from which we infer that he perceived his cost of living to be low. This factor is adverse to Mr. Bellwood.

7. Status of resident vs. transient sojourner. We are unable to determine Mr. Bellwood's legal status under Saudi Arabian law. Mr. Bellwood testified that he was in Saudi Arabia under a work visa, but the visa was not introduced into the record. Mr. Bellwood acknowledged that he could not participate in civic life in Saudi Arabia because he was not a citizen. As for the issue of transience, Mr. Bellwood testified that he intended to remain in Saudi Arabia for as long as his employment contract lasted, but not beyond that time; furthermore, he testified that he never intended to bring his family to Saudi Arabia, and that he always intended to return to his home in Georgia. The facts tend to indicate that Mr. Bellwood was thus a "transient" in Saudi Arabia. This factor is adverse to Mr. Bellwood.

8. Employer's tax treatment. The record does not include tax returns that PHI filed in Saudi Arabia. Each of Mr. Bellwood's Forms W-2, "Wage and Tax Statement", show Mr. Bellwood's address in Georgia, but they do not show anything regarding Saudi Arabia or Mr. Bellwood's status as a resident of that country. Especially given the Forms W-2, we cannot tell whether PHI's tax

[*28] treatment of Mr. Bellwood was different from its tax treatment of any employee who worked strictly within the United States. This factor is adverse to Mr. Bellwood.

9. <u>Marriage and family</u>. Mr. Bellwood's family was obviously important to him during the relevant years; and during that time his wife and youngest son lived in Georgia, his oldest son lived in New Jersey, and his parents lived in Maine. Mr. Bellwood's family never came to visit him in Saudi Arabia, and he never intended to bring them to Saudi Arabia. This factor is adverse to Mr. Bellwood.

10. <u>Nature and duration of employment</u>. Mr. Bellwood's employment as an air ambulance pilot for PHI's customer, the Saudi Red Crescent Authority, was undoubtedly full-time employment based in Saudi Arabia during the relevant years. Mr. Bellwood testified credibly that he intended to, and he in fact did, retain this position until PHI's contract in Ha'il ended, sometime during 2016. This factor is favorable to Mr. Bellwood.

11. <u>Good faith vs. tax evasion</u>. We see no indication of bad faith, but only good faith, in Mr. Bellwood's taking his job for PHI and working in Ha'il, Saudi Arabia. Nothing in the record indicates that Mr. Bellwood took the job outside of the United States for any tax-related reason, much less for a motive of

**[\*29]** tax evasion. Indeed, Mr. Bellwood testified credibly that he claimed the FEIE only because the TurboTax software showed it to be appropriate and because of his understanding that he qualified for the credit. This factor is favorable to Mr. Bellwood.

In sum, nine Sochurek factors weigh against finding bona fide residence in Saudi Arabia, and two weigh in favor. These two favorable factors do not constitute the "strong proof" of bona fide residence that a taxpayer must provide. Thus, Mr. Bellwood was not a bona fide resident of a foreign country during the years in issue, and consequently, he is not eligible for the FEIE.

## V. Unreimbursed employment expenses

Section 162(a) allows a deduction for ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business. Such deductions may include unreimbursed employment expenses, such as expenses incurred while away from home in the pursuit of a trade or business. Sec. 162(a)(2). However, the taxpayer bears the burden of proving entitlement to any deduction claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). This includes the burden of substantiation. Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976).

[*30] As a general matter, travel, meals, and entertainment expenses are subject to especially strict substantiation rules. See sec. 274(d) (flush language). Nevertheless, the Commissioner has prescribed rules for certain per diem allowances to be regarded as equivalent to substantiation in some instances. See 26 C.F.R. sec. 1.274-5(g), Income Tax Regs.; Rev. Proc. 2011-47, 2011-42 I.R.B. 520. Under such rules, an employee may be able to deduct certain expenses at the Federal per diem rate based on the locality of the employee's travel; however, if the employee's employer provides a per diem allowance to the employee, then the amount that is deemed substantiated is limited to the lesser of the employer's per diem or the Federal per diem. Rev. Proc. 2011-47, sec. 4.01, 4.02, 2011-42 I.R.B. at 522.

The Bellwoods claimed deductions for unreimbursed employment expenses. Mr. Bellwood testified that he calculated those amounts using the difference between the State Department's per diem allowance (which is unsubstantiated in the record) for the locality where he worked and the per diem allowance he received from PHI. Even if we presume that PHI would not have provided further reimbursement upon Mr. Bellwood's request, Mr. Bellwood was limited to the lesser of the PHI per diem or the Federal (State Department) per diem, unless he

[*31] could substantiate the excess amount. Thus, because the Bellwoods failed to substantiate the excess expenses, the deductions are disallowed.

VI.    Accuracy-related penalties

We now consider whether the Bellwoods are liable for accuracy-related penalties. See sec. 6662(a). A taxpayer is liable for an accuracy-related penalty as to any portion of an underpayment attributable to, among other things, a substantial understatement of income tax or negligence. Sec. 6662(a) and (b)(1) and (2). There is a substantial understatement of income tax if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A); 26 C.F.R. sec. 1.6662-4(b)(1), Income Tax Regs. The notice of deficiency, which made determinations we have sustained, determined an underpayment due to a substantial understatement of income tax required to be shown on the Bellwoods' return for each of 2013, 2014, and 2015.

The Commissioner has the burden of production and must present sufficient evidence that it is appropriate to impose a penalty. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). The burden of production with respect to penalties under section 7491(c) includes evidence of written supervisory approval as required by section 6751(b)(1), Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016), and the

[*32] Commissioner has sustained that burden by providing a copy of the Civil Penalty Approval Form, signed by a supervisor approving the initial determination. It is clear that the amounts of the understatements, even when the deficiencies are recomputed under Rule 155 with respect to the conceded amounts, see supra note 2, will remain "substantial" for purposes of section 6662(d)(1)(A).

Once the Commissioner has met the burden of production, the taxpayer must come forward with persuasive evidence that the penalty is inappropriate because, for example, he or she acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448-449. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. See 26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess her or his proper tax liability. Id. Other circumstances include the experience, knowledge, and education of the taxpayer, as well as the extent to which the taxpayer reasonably and in good faith relied on the advice of a competent professional tax adviser. Id. para. (c)(1); see Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

[*33] Taxpayers often invoke this "reasonable cause" defense by showing reliance on the advice of a tax professional. E.g., Woodsum v. Commissioner, 136 T.C. 585, 592 (2011). Such a contention requires the taxpayer to show three things by a preponderance of the evidence: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

When asked about return preparation at trial, Mr. Bellwood stated that he relied on TurboTax software for preparing his returns and that he input the information requested. Although this Court has not held that TurboTax or other tax preparation software would qualify or fail to qualify as advice of a "competent professional", we have held that "[t]ax preparation software such as TurboTax is only as good as the information the taxpayer puts into it. The misuse of tax preparation software, even if unintentional or accidental, is no defense to accuracy-related penalties under section 6662." Langley v. Commissioner, T.C. Memo. 2013-22, at *9-*10 (citations omitted). Despite Mr. Bellwood's testimony as to the information he input into TurboTax, there are various foot faults evident on his returns that indicate errors in his use of the software. For example, on each

[*34] of his Forms 2555, Mr. Bellwood listed "Maine" as his tax home (but did not list either Georgia or Saudi Arabia), which would seem to contradict both his testimony that he moved from Maine to Georgia in 2013 and that he maintained a foreign tax home for 2013 through 2015. On his Form 2555 for 2014, Mr. Bellwood completed Part III for the 330-day Physical Presence Test, but he listed dates that showed he was in Saudi Arabia for only 210 days during 2014, 120 days fewer than the test required. On his Form 2555 for 2015, Mr. Bellwood completed Part II for the bona fide residency test and listed days of physical presence in Saudi Arabia including "01-14-2015" to "02-15-2015" and "03-11-2015" to "04-12-2015", but these dates seem plainly wrong: On his August 2016 schedule, he did not list any days in Saudi Arabia prior to March 24, 2015, but stated "[i]llness from late JAN thru early MAY 2015"; and his expense vouchers for 2015 also indicate that no voucher was submitted for February 2015 "due to missing work for the entire month". These inconsistencies or inaccuracies on the returns show several respects in which Mr. Bellwood failed to properly input information into TurboTax, and we cannot fault TurboTax for his unwarranted claim of the FEIE. Therefore, even if tax preparation software should be thought of as the equivalent of a "competent professional", the Bellwoods would not be

**[*35]** able to show justified reliance on advice from such a professional to claim the FEIE.

As for the unreimbursed employment expenses deducted for each year, Mr. Bellwood failed to provide any substantiation for deducting those expenses. Furthermore, Mr. Bellwood testified that his reason for deducting such expenses was that someone--whom he could not remember at trial--told him the deductions were allowed. Such facts do not establish reasonable cause.

On the basis of the evidence, the Bellwoods failed to show the Court that the accuracy-related penalties determined by the IRS were inappropriate.

To reflect the foregoing,

<u>An appropriate decision will be entered</u>.