BERT J. SCHONEBERGER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11885–78.   Filed August 7, 1980.

*Richard L. Carico*, for the petitioner.
*Alan C. Parsons*, for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $8,533.50 in petitioner's 1975 Federal income tax. The issue for decision is whether petitioner was a bona fide resident of

France, entitled to the earned income exclusion of section 911(a)(1),[1] during all or any part of the taxable year in question.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

At the time of filing the petition herein, petitioner lived in Paris, France. Petitioner is now, and has always been, a citizen of the United States. He filed his 1975 Federal income tax return with the District Director of Internal Revenue at Philadelphia, Pa.

Petitioner is a pilot for TransWorld Airlines (TWA). He began to work for TWA in 1966. Since April 1974, petitioner has worked in TWA's International Division, based at Hangar 12, John F. Kennedy Airport (JFK), Jamaica, N.Y.

From April 1974 through November 1974, petitioner, when not on duty, stayed in or near Paris with the family of a French woman he was dating or traveled through the south of France.

From December 1974 until April 1975, petitioner, along with three other TWA pilots, rented a house in Morzine, a town in a ski resort area of eastern France. In France, the winter sports season runs from December through April with the height of the season in December and February. Petitioner took his vacation for 1975 in February in Morzine.

At the end of March 1975, petitioner signed a lease to rent an unfurnished studio apartment in Paris. The term of the lease was 1 year, to begin April 15, 1975, and was automatically renewable, unless terminated on 2-months' notice by either party. Petitioner purchased furniture for that apartment in a Paris store. He lived there until February 1978, when he moved to another, larger apartment in Paris because he was getting married.

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect in the taxable year at issue, unless otherwise specified. For taxable years beginning after Dec. 31, 1977 (see Pub. L. 95–615, sec. 209(a) and (c), 92 Stat. 3097, 3109 (1978)), sec. 911(a) has been limited in its application to individuals residing in camps located in hardship areas. Pub. L. 95–615, *supra*, sec. 202(a), [or] and (f)(1), 92 Stat. at 3098.

[2]The parties have stipulated that, if the Court finds that petitioner was a bona fide resident of France for the requisite period, they will compute the amount excludable from petitioner's income in accordance with Rev. Rul. 77–167, 1977–1 C.B. 239.

From April 1974 through at least the end of 1976, petitioner did not maintain a place of abode in the United States; he did have furniture stored with a friend in the United States.

While in Morzine, petitioner skied, and during his vacation in February 1975, he took a course in French in Morzine. At the end of 1975, he took another French course in Paris.

While in Paris during the period April 1974 through at least the end of 1976, petitioner engaged in activities with his girlfriend's family and also socialized with American and French people. He did not belong to any social clubs or business organizations in France nor had he ever belonged to such groups in the United States.

Petitioner purchased a Peugeot automobile in France in November or December of 1974. He had, at that time, a Porsche which he had bought in 1969 and had left in the United States with a friend who drove it and paid the insurance on it. After the Peugeot broke down, he had the Porsche transported to France because it was more economical than buying a new car in France.

During the years 1974 through 1976, petitioner had a driver's license issued by the State of Nevada. Petitioner traveled to Nevada in the summer of 1978 and renewed the license at that time. He has never possessed a French driver's license. An individual may operate an automobile in France without a French license if he has a foreign license conforming to the model approved by international convention; a foreign license drafted in French, or, a foreign license accompanied by an official French translation.[3] The foreign license may be used for a period of 2 years from the date of last entry into French territory. This period is automatically renewed each time the individual returns to France regardless of the motive for, or duration of, the trip abroad.

During 1975, and at all other relevant times, petitioner primarily flew international flights to western Europe and the Middle East, but also, on occasion, flew between airports in the United States. Petitioner commuted between Paris and New York on regularly scheduled TWA flights to start on his assigned flights or to return to Paris on completion of such

---

[3]All relevant matters of French law have been stipulated by the parties.

flights. He could ride on such flights without charge and was qualified to ride in the cockpit if no seats were available in the cabin of the airplane. The trip from Paris took less than 8 hours. While petitioner lived in Morzine, he flew to Paris on Air France from Geneva in order to connect with a TWA flight from Paris to New York. The flight took approximately 40 minutes.

Petitioner normally arrived in New York from Paris on the day before the flight on which he was scheduled to work. He stayed in a hotel near JFK the night before the flight and reported to JFK in the late afternoon or evening of the next day. He was required to be at JFK 2 hours before the departure of an assigned flight. At all other airports, he was required to be at the airport 1 hour before departure. His procedures on termination of a flight took only a few minutes.

Petitioner received flight assignments pursuant to a bidding system based on seniority. Petitioner had relatively high seniority during the period April 1974 through at least the end of 1976 and received most of the assignments for which he bid. Petitioner generally had two tours of duty per month of varying lengths. His time off duty between flight tours ranged from a day to a few weeks. If the period was short, e.g., 4 days, he would remain at a hotel in New York. If the period was long enough, e.g., 7 days, he would return to France. If petitioner had a layover in Paris on one of his flights, he would stay in his apartment. He flew in and out of French airports 6 times while on duty in 1975.

TWA neither required nor forbade petitioner's residing at other than his home base and never objected to his residing in France. Petitioner spent approximately 12 to 15 days off-duty per month in Paris, and he took his vacations in France.

Petitioner opened a checking account in Morzine, France, in 1974. He moved that account to Paris in April 1975 and at the same time opened a savings account with the same bank. At that time, petitioner also acquired a French credit card (Carte Bleu) and a gasoline credit card.

Petitioner also had a checking account with Citibank and a savings account with the TWA Credit Union at Kennedy Airport from April 1974 through at least the end of 1976. Petitioner's paycheck was deposited in the Citibank checking account, and petitioner would make transfers from that account to his account in France by check or would purchase traveler's checks.

Petitioner has had a Master Charge card since April 1974 in connection with his Citibank checking account. Petitioner had no direct charge accounts at any stores in either the United States or in France.

Petitioner owned rental property in Tucson, Ariz., and Fremont, Calif., from April 1974 through at least the end of 1976. He sold the property in Tucson during 1976. He never lived in either property.

Petitioner invested directly in American mutual funds from April 1974 through at least the end of 1976. He did not have a broker in the United States or in France during that period. All correspondence regarding the mutual funds was mailed to him at his address in France.

Persons entering France must hold either tourist visas (for stays of 3 months' duration or less) or long-term visas (for stays exceeding 3 months' duration).[4]

U.S. citizens, however, are exempt from the tourist visa requirement and can enter France and stay for up to 90 days without acquiring a visa. A U.S. citizen legally can stay in France for a period of 90 days or less, leave the country for 1 or more days, and return to start a new 90-day period. As long as the process is not used deliberately to avoid visa requirements, a U.S. citizen would experience no difficulties with French authorities; however, he would not be considered a resident under French immigration laws.

The standard procedure for a U.S. citizen wishing to stay in France for longer than 90 days is to obtain a residence permit, from police authorities, and a visa, running for concurrent periods. France has three types of residence permits: (a) Carte de Sejour Temporaire (for periods up to 1 year); (b) Carte de Sejour Ordinaire (for a 3-year period); and (c) Carte de Sejour Privelegie (permanent).

Aliens can acquire the permanent residence permit only upon holding a Carte de Sejour Ordinaire for 3 years. In all visa applications, with the exception of the application for a permanent visa, the applicant must declare that he will leave French territory at the expiration of the visa.

Petitioner did not apply for a visa before he left for France in

---

[4]See n. 3 *supra.*

April 1974. At a later time, he consulted a French attorney who advised him that, in his circumstances, a visa was unnecessary. In May 1975, petitioner applied for, and received, a Carte de Sejour Temporaire valid for the 6-month period from May 4, 1975, to November 4, 1975. He obtained the card because he was considering purchasing an apartment and understood that he had to have such a card to buy property in France. He did not renew this card when it expired, as he had decided not to purchase the apartment for financial reasons.

Petitioner's U.S. passport for the period June 26, 1972, through June 25, 1977, was issued in the United States. Petitioner listed a post office box in Zephyr Cove, Nev., as his address on that passport. Petitioner's current passport was issued in Paris in 1977 and lists Paris, France, as his address. Petitioner's passport was generally not stamped by immigration officials when he entered and left France because he traveled as part of a flight crew.

Petitioner did not notify the U.S. Consulate of his presence in France as recommended by the U.S. State Department on passports for an American staying in a foreign country for a prolonged period. Except when paying real estate taxes, petitioner did not advise local French authorities that he was residing in France. Aliens holding resident cards are required to report changes of address to French authorities; however, during the period petitioner had a resident card, he did not change his address.

Petitioner did not make any claim or representation to French authorities regarding his liability for income taxes to France. Petitioner paid no income taxes to France for 1974, 1975, or 1976, relying upon advice that he was not liable for such taxes. Petitioner paid real estate taxes on the apartment he rented in Paris and paid value-added taxes on purchases he made in France. TWA withheld U.S. income tax from petitioner's salary during 1974, 1975, and 1976.

Petitioner had medical examinations in the United States for TWA and the Federal Aviation Administration (FAA) during the period from April 1974 through 1976. In 1977, petitioner received medical treatment for a hearing problem in San Francisco from a doctor who was recommended to him by an FAA examiner as a specialist in treating people in the field of aviation. Petitioner had no illness requiring medical attention

from April 1974 through at least the end of 1976 and saw no doctor or dentist in France during that time.

Petitioner last voted in a U.S. election prior to 1974 in Nevada.

Petitioner's parents and brother lived in Arizona, and his grandmother lived in Ohio. Petitioner visited his relatives in Arizona once or twice in 1975 and 3 or 4 times in 1976 when his father was ill.

Petitioner's principal reasons for moving to and living in France were personal and not related to his employment. Petitioner had no specific intention in April 1974 regarding the time he would stay in France and has not formulated any such intention since that date. In 1974, he thought that he might marry the French woman he was dating, and she wanted to remain in France. He ultimately married another French woman in 1978. Petitioner went to France in good faith and not for the purpose of tax evasion.

### ULTIMATE FINDING OF FACT

Petitioner was a bona fide resident of France for an uninterrupted period beginning on April 15, 1975, and continuing throughout the year 1976, but was not a bona fide resident of France prior to April 15, 1975.

### OPINION

Section 911(a) provides that a citizen of the United States, who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country for an uninterrupted period which includes an entire taxable year, may exclude from gross income earned income from sources without the United States attributable to such period.[5] The issue that we must decide is whether petitioner was a bona fide resident of France during either the entire taxable year 1975 or an uninterrupted period beginning sometime in 1975 and including the entire taxable year 1976.[6]

The Internal Revenue Code does not define residence. Whether a citizen of the United States is a bona fide resident of a

---

[5]The exclusion is subject to the limitations set forth in sec. 911(c).

[6]Petitioner does not contend that sec. 911(a)(2), which requires presence in a foreign country for at least 510 days during a period of 18 consecutive months, is applicable.

foreign country, for purposes of section 911(a)(1), is primarily a factual question requiring an analysis of all relevant facts and circumstances. *Dawson v. Commissioner*, 59 T.C. 264, 268 (1972); *Harvey v. Commissioner*, 10 T.C. 183, 188 (1948). To the extent feasible, the principles to be applied are those of section 871 and the regulations thereunder relating to what constitutes residence in the United States in the case of an alien individual. *Riley v. Commissioner*, 74 T.C. 414 (1980); *Maclean v. Commissioner*, 73 T.C. 1045 (1980); sec. 1.911-2(a)(2), Income Tax Regs.; sec. 1.871-2(b), Income Tax Regs. A listing of factors which have been considered relevant in determining whether a person is a bona fide resident of a foreign country was set forth in *Sochurek v. Commissioner*, 300 F.2d 34, 38 (7th Cir. 1962), revg. 36 T.C. 131 (1961), which listing we accepted in *Dawson v. Commissioner, supra* at 268 n. 4.

Respondent argues that, because section 911(a)(1) requires that bona fide residency be established "to the satisfaction of the Secretary or his delegate," more than the usual burden of proof is placed on the petitioner in contesting the Commissioner's determination. Respondent contends that the petitioner must offer *strong proof* that he was a bona fide resident of France and that any doubts should be resolved in favor of respondent. Respondent does not dispute that his determination is subject to our review nor would such position be sustainable. See *Sochurek v. Commissioner*, 36 T.C. at 137; cf. *Dwinnell & Co. v. Commissioner*, 33 T.C. 827, 834 (1960). Moreover, respondent does not assert that petitioner must show that the Commissioner's determination was arbitrary (compare *Roanoke Vending Exchange, Inc. v. Commissioner*, 40 T.C. 735, 741 (1963)), or not supported by substantial evidence (compare *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896 (1979), on appeal (5th Cir., Feb. 11, 1980)), standards of review which would impose a higher burden on petitioner than the "strong proof" test for which respondent contends.

The phrase in question was introduced into section 116(a) of the Internal Revenue Code of 1939, the predecessor of section 911(a)(1), by the Revenue Act of 1942, 56 Stat. 798, 841. The legislative history of that act does not contain an explanation of the significance which Congress intended to attach to such phrase. See S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 548-549, 591; H. Rept. 2586, 77th Cong., 2d Sess. (1942),

1942–2 C.B. 701, 708. The legislative history of that act and of the Revenue Act of 1951, 65 Stat. 452, 498, which added the additional test now found in section 911(a)(2), indicates, however, that Congress intended to tighten the requirements of the exemption.[7] See S. Rept. 1631, *supra*, 1942–2 C.B. at 548, 591; S. Rept 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 458, 495–496, 571–572; *Swenson v. Thomas*, 164 F.2d 783–784 (5th Cir 1947); *Meals v. United States*, 110 F. Supp. 658, 660 (N.D. Cal. 1953); *Estate of Roodner v. Commissioner*, 64 T.C. 680, 683 (1975).

We agree with respondent that the phrase in question requires the additional deference to the Commissioner's determination which is implicit in the application of a "strong proof" standard. To conclude otherwise would be to interpret such phrase as redundant and meaningless (see *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307–308 (1961); *Platt v. Union Pacific R.R. Co.*, 99 U.S. 48, 58 (1878); *Tionesta Sand & Gravel, Inc. v. Commissioner*, 73 T.C. 758, 763 (1980), on appeal (3d Cir., May 1, 1980); see also 2A J. Sutherland, Statutory Construction, sec. 46.06 (4th ed. 1973)), in view of the fact that petitioner in any event would have the burden of proof by a preponderance of the evidence. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Such a result would be particularly inappropriate in light of the legislative history indicating that Congress intended to tighten the exemption.[8]

Having carefully weighed all the relevant facts and circumstances in light of this standard of proof, we conclude that petitioner was a bona fide resident of France beginning on April

---

[7] In 1942, the standard for exemption was changed from nonresidency in the United States to bona fide residency in a foreign country in order to increase the restrictiveness of the statute's requirements. In 1951, Congress recognized the rigidity of those requirements but chose to add a separate test (510 days out of 18 months, see sec. 911(a)(2)) rather than to modify the bona fide residency test.

[8] Accord, *Nold v. Commissioner*, T.C. Memo. 1967–171; *Sherman v. Commissioner*, T.C. Memo. 1965–126. Although sec. 911(a)(1) has been the subject of frequent litigation, the question of the significance of the phrase "to the satisfaction of the Secretary" appears to have been considered only in these two cases, apparently because the issue was simply not raised by the parties in other cases. See *Johnson v. Commissioner*, 7 T.C. 1040, 1045 (1946). Petitioner's reliance on the case of *Souza v. Commissioner*, 33 T.C. 817, 825 (1960), is misplaced, although we stated therein that petitioner had failed to prove bona fide residency in a foreign country "by a preponderance of the evidence." First, no issue was raised in that case as to the correct standard of proof. Second, it would have been unnecessary in any case to decide such issue; since petitioner therein failed to establish bona fide residency by a preponderance of the evidence, he clearly would not have met the more stringent standard of "strong proof."

15, 1975, and throughout the remainder of 1975 and 1976, but was not a bona fide resident of France prior to April 15, 1975.

First, we note that petitioner's situation is somewhat unusual, because of his job as a TWA pilot flying international flights. His employment required that, wherever his residence was, he would spend substantial periods of time away from it. At the same time, it gave him special flexibility in choosing a place of residence because he was able to fly free of charge. Moreover, he was only on duty during certain periods of each month and, thus, had blocks of time when he did not have to be near his work base at JFK airport in New York. In addition, his employer had no objection to his residing in a country other than that in which he was based for employment purposes.

We recognize that Congress' primary intent in enacting section 911(a) and its predecessors was to lighten the burdens on Americans working abroad and encourage foreign trade. S. Rept. 781, *supra*, 1951–2 C.B. at 495; *Swenson v. Thomas, supra*. The statute does not require, however, that the foreign country of residence also be the primary place of employment (see *Sochurek v. Commissioner*, 300 F.2d at 36, 39; cf. *Perkins v. Commissioner*, 40 T.C. 330 (1963); Rev. Rule 72–423, 1972–2 C.B. 446)), although that is the usual situation. See also *Johnson v. Commissioner*, 7 T.C. 1040, 1051–1052 (1946), indicating that the questions of residence and "tax home" are not identical.

Respondent's reliance on *Fly v. United States*, an unreported opinion (S.D. Fla. 1967, 20 AFTR 2d 5073, 67–2 USTC par. 9601), for the proposition that a business motive is necessary for a finding of bona fide residence under section 911(a)(1), is misplaced. In that case, the court found that the taxpayer, also a pilot flying international flights from a base within the United States, had established a purported residence in Nassau for the purpose of avoiding U.S. taxes, while also maintaining and using an apartment in the United States. It was in this context, where the taxpayer's personal reason for maintaining a place of abode in a foreign country was tax evasion and he and his wife actually lived in the United States, that the court noted that the taxpayer had no legitimate business purpose for establishing a foreign residence. In the instant case, however, we, contrary to respondent, find no indication in the record that petitioner's move to France was tax motivated, and we have found as a fact that petitioner went to France in good faith, motivated by

personal considerations unrelated to tax avoidance. See *Benfer v. Commissioner*, 45 T.C. 277, 293 (1965); *Dawson v. Commissioner*, 59 T.C. at 269. Moreover, he did not have a place of abode in the United States during the relevant period. *Lemery v. Commissioner*, 54 T.C. 480, 487 (1970). His trips to the United States were those dictated by his job or were family visits (see *Rose v. Commissioner*, 16 T.C. 232 (1951); sec. 1.911–2(a)(2), Income Tax Regs.), and he was otherwise physically present in France at all possible times, consistent with the demands of his employment. See *Sochurek v. Commissioner*, 300 F.2d at 38.

Moreover, we think that these, along with other objective facts in the record, and the testimony of petitioner, whom we found a forthright and credible witness, indicate that, no later than April 15, 1975, petitioner had formed an intention to remain in France for an extended, yet indefinite, period. See *Dawson v. Commissioner*, 59 T.C. at 268; sec. 1.871–2(b), Income Tax Regs. At that time, petitioner returned to Paris, where in the previous year he had stayed as a guest of his girlfriend's family, and occupied his own apartment under a 1-year lease, signed at the end of March of that year.[9] He purchased furniture for that apartment. See *Chapman v. Commissioner*, 9 T.C. 619 (1947). Additionally, at about that time, he considered purchasing, instead of renting, an apartment in Paris and, therefore, acquired a residency card which he believed to be necessary for that purpose. In April 1975, he opened a checking account and savings account in Paris and acquired French credit cards.

Petitioner made efforts to become assimilated into the French environment. See *Weible v. United States*, 244 F.2d 158–159 (9th Cir. 1957); *Scott v. United States*, 193 Ct. Cl. 27, 42, 432 F.2d 1388, 1397–1398 (1970). He studied the French language. He had French as well as American friends. He dated a French woman whom he thought he might marry and who wanted to remain in France. He participated in activities with her family. His testimony at trial indicated that family activities are an important aspect of French social life. We draw no negative inferences from the fact that petitioner belonged to no civic or

---

[9]The parties disagree as to the interpretation of a provision in the lease allowing termination with 2 months' notice. We, like petitioner, interpret this as allowing termination after the initial 1-year lease period had expired and its automatic renewal provision had taken effect. Otherwise, the 1-year term would have no significance. See findings of fact, *supra* at p. 1017.

social organizations in France since he never belonged to such organizations in the United States.

Respondent, relying on the last sentence of section 1.871-2(b), Income Tax Regs.,[10] argues that because petitioner's stay in France was limited, by French immigration laws, to 90 days during most of the relevant period, since he did not have a visa, and to 6 months during one period in 1975 when he had a visa, he was not a resident of France for purposes of section 911(a)(1). We have held, however, that the immigration laws are not conclusive of the issue of residency for Federal tax purposes and that nominal restrictions are of little weight. *Brittingham v. Commissioner*, 66 T.C. 373, 414 (1976), affd. on another issue 598 F.2d 1375 (5th Cir. 1979); *Constantinescu v. Commissioner*, 11 T.C. 37, 42–44 (1948). We think this particularly true when we are dealing with foreign, rather than U.S., law.

The parties have stipulated that French law permitted petitioner to remain in France indefinitely if he left and reentered the country once every 90 days, so long as this process was not used deliberately to avoid visa requirements. Because petitioner's job as an international pilot required him to leave France frequently in any 90-day period, we think that the restrictions imposed on his stay in France by French immigration laws were merely nominal. Petitioner had sufficient seniority that there does not appear to have been a significant possibility that he would not continue flying international flights in the foreseeable future. The record shows that, despite the nominal restriction, petitioner was able to stay in France over a substantial period of time. Moreover, petitioner was advised by a French attorney that a visa was not necessary in his circumstances. Thus, this case is distinguishable from *de la Begassiere v. Commissioner*, 31 T.C. 1031 (1959), affd. per curiam 272 F.2d 709 (5th Cir. 1959), on which respondent relies, where the Court found that the taxpayer had no adequate reason for not obtaining a permanent visa.[11] We think that the petitioner

---

[10]That sentence states: "An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances."

[11]*Sanford v. Commissioner*, T.C. Memo. 1968–50, on which respondent also relies, is distinguishable because the Court therein found that the taxpayer "was precluded by the immigration and naturalization laws from making her tenure in the United States more

herein had adequate reason and that such reason constituted the "exceptional circumstances" required by the regulation.

In light of the entire pattern of behavior supporting petitioner's claim of status as a resident, rather than a transient or sojourner, at least for the period beginning on April 15, 1975, we think several of the facts which respondent calls to our attention are of little significance. Thus, the facts that petitioner left some possessions in the United States, received medical examinations in the United States, and used a U.S. driver's license, indicate to us no more than petitioner may have continued to regard the United States as his domicile, which does not prevent a finding of bona fide residency in a foreign country for purposes of section 911(a)(1).[12] *Weible v. United States*, 244 F.2d at 163; *Dawson v. Commissioner*, 59 T.C. at 270.

Additionally, although the fact that petitioner did not pay income taxes to France is a factor to be considered, *Harvey v. Commissioner*, 10 T.C. at 189, it is not dispositive, particularly where, as here, there was no motive of tax avoidance for petitioner's choosing to live in France. *Dawson v. Commissioner*, 59 T.C. at 269. In this latter connection, we note that petitioner made no statements to the French authorities regarding his liability to tax. Cf. sec. 911(c); *Scott v. United States, supra; Riley v. Commissioner, supra.* Petitioner did pay value-added taxes and, after renting his Paris apartment, paid real estate taxes. Similarly, although we have taken the fact that TWA withheld U.S. income tax from petitioner's entire salary into account (see sec. 3401(a)(8)(A)), it is clear that this element is not determinative. See *Sochurek v. Commissioner*, 36 T.C. at 139.

As to the period prior to petitioner's renting the apartment, however, we are left with some doubts which, because of the application of the standard of proof which we have discussed, *supra,* we must resolve in favor of respondent. During the period from April 1974 until April 1975, petitioner stayed with his

definite that the status of an alien crew member of an aircraft," which allowed a stay of 29 days. While petitioner's job as a crew member made it unnecessary for him to obtain a permanent visa, his stay in France was not conditioned upon his remaining an aircraft crew member and, as his acquisition of a 6-month visa in May 1975 shows, the immigration laws of France did not provide an absolute bar to his remaining in France longer than a 90-day period.

[12]Nor do we consider the fact that he did not follow the State Department's suggestion that a person residing abroad for a prolonged period report to the American Consulate significant under the circumstances of this case.

girlfriend's family in Paris, traveled in France, and, for 4 months, rented a house at a French ski resort. These circumstances could be indicative of the status of a tourist or vacationer, a mere sojourner or transient, rather than a resident. Nevertheless, with regard to the period beginning on April 15, 1975, and extending throughout 1976, we think the entire record contains strong proof that petitioner's intention was to live in France for an indefinite, but extended, period; that he was assimilated into the French community; and that he was, therefore, during that period, a bona fide resident of France.

*Decision will be entered under Rule 155.*