T.C. Memo. 2021-103

UNITED STATES TAX COURT

DEBORAH C. WOOD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 23239-18, 23260-18.               Filed August 18, 2021.

<u>R. Brian Gardner III</u> and <u>Ethan J. Vernon</u>, for petitioner.

<u>Christopher D. Bradley</u>, <u>Danielle A. Pollack</u>, <u>Rebeccah L. Bower</u>, and <u>John T. Arthur</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  For tax years 2012-16 the Internal Revenue Service (IRS or respondent) determined Federal income tax deficiencies totaling $95,301, plus additions to tax and accuracy-related penalties.  Petitioner timely petitioned this

[*2] Court.  We consolidated her cases for trial, briefing, and opinion.  After concessions by both parties, two issues remain for decision:  (1) whether petitioner is entitled to exclude from gross income, as "foreign earned income" under section 911(a)(1), the wages she earned while employed as a contractor on a U.S. military base in Afghanistan; and (2) whether petitioner for 2015 is liable for a late-filing addition to tax under section 6651(a)(1).[1]  We resolve these issues mostly in petitioner's favor.

FINDINGS OF FACT

The parties filed a first stipulation of facts and a supplement to the first stipulation of facts, both with attached exhibits, that are incorporated by this reference. Petitioner resided in Afghanistan when she filed her petitions.

A.    Petitioner's Background and Prior Military Service

Petitioner grew up and attended high school in Boston, Massachusetts.  Her parents, siblings, and other relatives still reside in the Boston area.  Petitioner has never been married and has no children.

---

[1]Unless otherwise noted, statutory references are to the Internal Revenue Code in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  We round monetary amounts to the nearest dollar.

[*3]   In 2001, during her junior year of high school, petitioner joined the Army Reserves.  She graduated from high school the following year, completed specialty military training, and was deployed to Iraq from 2003 to 2005.  In Iraq she specialized in logistics, coordinating transportation for vehicle convoys, rail movements, and air transport.  After her U.S. Army deployment ended in 2005, she returned to her family in Boston.

In late 2005 petitioner moved to Texas and rented an apartment near Fort Hood.  She started working for Dell Technologies (Dell) in 2006 as an account manager, working on accounts for small and midsize businesses.  She earned about $70,000 a year in that job.  In June 2011 she decided to purchase a house in a new development under construction in Pflugerville, Texas, also near Fort Hood.  She did so because rents were increasing and she regarded real estate as a good long-term investment.

Petitioner was an active member of the Army Reserve through 2007 and an inactive member until 2009.  In mid-2011 she became increasingly dissatisfied with corporate life.  As she testified at trial:  "I just kind of spaced-out at work one day and I messaged one of my friends and I said, hey, you know, I'm not feeling like I quite belong here."  She began looking for defense contracting jobs overseas.

**[*4]** Petitioner explained that she had both personal and financial motivations for investigating these opportunities. She missed the close bonds that she had formed with her colleagues--mostly young service members about her age--while living and working on military bases in Iraq. By becoming a defense contractor, she believed that she could put to best use the logistics skills she had learned during her time in the military. Foreign defense contractor jobs paid a much higher salary than she was then earning. No less importantly, petitioner sought the personal satisfaction of advancing her career in a traditionally male-dominated field.

Petitioner received her first offer from a defense contractor operating in Kuwait. She turned that offer down because Kuwait was not in a war zone and the salary was on the low end of the spectrum. In October 2011 she received an offer from AC First, LLC (AC First), to work in Afghanistan. That offer came with a six-figure salary, and she accepted it at once.

Petitioner's house in Pflugerville was completed in late October 2011. She registered her 10-year-old car at that address and left it parked in the garage. She departed for Afghanistan one month later.

When AC First recruited petitioner, and again during her onboarding in Afghanistan, the staff explained that she was eligible for certain U.S. tax benefits. Specifically, she was told that most of the salary she earned as a contractor would

[*5] be eligible for the foreign earned income (FEI) exclusion, provided that she stayed outside the United States for the requisite amount of time. The staff explained that she could elect to have no U.S. tax withheld from her wages, and she chose that option.

Petitioner spent her first four months in Afghanistan at Shindand Air Base before being transferred to Kandahar Airfield, a U.S. military facility, in spring 2012. At that time, up to 50,000 people worked at Kandahar Airfield, including U.S. military service members, contractors, and NATO forces. Petitioner's first job was as a transportation management coordinator doing work similar to what she had done for the Army in Iraq. She had a one-year renewable employment contract and was paid $110,640 her first year. She earned several promotions at AC First and ultimately became a supervisor.

B.     Petitioner's Life as a Contractor in Afghanistan

Petitioner typically worked a 12-hour shift daily. She had a one-hour lunch break and a half day off every two weeks. The only housing available to her was that provided on the base as part of her employment. For the first several months, this housing consisted of a large tent shared with other women. Later petitioner lived in modular housing made of retrofitted shipping containers. She shared a

[*6] bathroom and often shared her modular housing unit with a roommate. The U.S. Government provided her three meals a day at the base's dining facility.

While she lived at Kandahar Airfield, petitioner socialized with others on the base and formed close friendships. She enjoyed celebrating holidays and birthdays on the base, as well as traveling internationally with her friends. During 2012-16 she visited Thailand, Australia, Monaco, France, Romania, Tanzania, Kenya, the United Arab Emirates, and the Maldives during her vacation periods. For a period of time, she had a romantic relationship with another contractor who also worked overseas.

Petitioner embraced the diversity of the base, sharing recipes from her Jamaican heritage and learning to make dishes from other cuisines. Much of the social life was centered around the "boardwalk" area, which consisted of shops and restaurants surrounding a soccer field and encircled by a running track. The boardwalk had a cigar club and a beauty parlor, as well as American chain restaurants, including Popeye's and TGI Fridays. As petitioner explained, this was a popular place to "hang out." She regularly attended barbecues and dances, went to the gym, watched sporting events, and took part in weightlifting competitions.

Petitioner did not carry a weapon as part of her employment. For security reasons, she was not permitted to leave the base except when departing for interna-

[*7] tional travel. She did not, and could not, travel within Afghanistan because it was a war zone.

Petitioner speaks only English. The Afghans with whom she interacted consisted almost exclusively of day laborers and cleaning staff on the base, and she described them as reluctant to speak with Western women. Because she had little meaningful contact with local people, learning Pashto or Dari (the local languages) would have been of no practical use.

Petitioner had U.S. bank accounts and credit cards during the years at issue. She was paid in U.S. dollars, and her paychecks were deposited by her employer directly into her bank account. Businesses on the base, such as the restaurants on the boardwalk, uniformly accepted U.S. dollars and generally did not accept Afghan currency. Contractors and service members typically paid their bills with cash, credit cards, or EagleCash--a stored value card linked to the user's bank account--that is widely used on military bases. When needing items not available for purchase on the base, petitioner submitted orders to Amazon.com.

Because she was generally forbidden to leave the base, it would have been difficult for petitioner to open an account at an Afghan bank. In any event, opening a local bank account would have afforded her no benefits and complicated her security clearance, which she was required to maintain as a condition of her em-

[*8] ployment. For similar reasons, it would have been impractical and inadvisable for her to purchase real estate or make other investments in Afghanistan. As a condition of her employment, petitioner was required to maintain a valid driver's license from the country that issued her passport. Petitioner's driver's license is a Texas driver's license which lists the Pflugerville house as her address.

Petitioner used some of her vacation time to make trips to the United States. Every trip included a visit to Texas to check on her property. Some trips included visits to Boston to see her family, and in March 2013 she spent five days in Jamaica attending her grandmother's funeral. She usually rented a car during her visits to Texas because the registration on her automobile had expired. She spent 22 days in the United States during 2012, 42 days during 2013, zero days during 2014, and 40 days during 2015 (including June 7-23). She did not rent out her house in Texas, which remained unoccupied except when she was visiting.

Petitioner's employment with AC First ended on April 19, 2016, because of a military drawdown in the region. Before she left Afghanistan, another defense contractor, DynCorp International, LLC (DynCorp), orally promised her a position, again at Kandahar Airfield. But that offer was contingent on the availability of funding, which was uncertain as of April 2016.

**[*9]** Petitioner accordingly returned to Texas, arriving on April 21, 2016. She immediately began looking for other defense contracting work in Afghanistan in case the DynCorp offer did not come through. She did not look for any job in the United States. Indeed, when an ex-military friend suggested job opportunities at an employer in Georgia, petitioner expressed no interest in pursuing such an offer. While out of work in 2016 she filed for and received Texas unemployment compensation. She was registered to vote in Texas throughout the years at issue; she voted in November 2016 but did not vote in U.S. elections when living in Afghanistan.

In December 2016 DynCorp secured the funding it needed to hire petitioner and offered her another position at Kandahar Airfield. She accepted the offer and departed for Afghanistan on December 24, 2016. She continued to live and work at Kandahar Airfield, employed by DynCorp, through the date of trial. She credibly testified--and we find--that she planned to continue working as an overseas contractor as long as these jobs continue to be available to her.

C.    Petitioner's Tax Returns and Notices of Deficiency

An IRS revenue agent (RA) contacted petitioner in 2015 about her failure to file returns. On May 26, 2015, the IRS received petitioner's Forms 1040, U.S. Individual Income Tax Return, for 2012-14. She explained in a cover letter that she

[*10] had been confused about the need to file U.S. tax returns while working on a U.S. military base overseas and that she filed these returns as soon as she became aware that they were delinquent. The IRS received petitioner's Form 1040 for 2015 on October 26, 2017. On April 3, 2018, she provided the RA with a copy of her Form 1040 for 2016. All five returns were prepared by a tax preparation company that specialized in work for Americans living abroad.

On August 24, 2018, the IRS sent petitioner timely notices of deficiency for 2012-16, and she timely petitioned this Court. After concessions by both parties, the sole issues remaining for decision are whether petitioner's wages from AC First qualified for the FEI exclusion and whether she is liable for a late-filing addition to tax for 2015.[2]

We tried the case remotely via Zoomgov in February 2021 during the Court's Albuquerque, New Mexico, trial session. Petitioner testified, as did seven other current or former defense contractors who knew her in Afghanistan.

---

[2]Petitioner has conceded that, for 2012, she received but did not report taxable pension and annuity income of $14,131 and that she is liable for a 10% additional tax under section 72(t). Petitioner has conceded that, for 2016, she received but did not report taxable interest of $81 and unemployment compensation of $12,454. Respondent has conceded that petitioner is not liable for any accuracy-related penalties under section 6662(a), any additions to tax under section 6651(a)(2) or 6654, or additions to tax under section 6651(a)(1) for 2012-14 or 2016.

[*11]                                   OPINION

I.      Foreign Earned Income Exclusion

Section 61(a) provides that gross income means "all income from whatever source derived." Citizens of the United States are taxed on their worldwide income unless a specific exclusion applies. Specking v. Commissioner, 117 T.C. 95, 101-102 (2001), aff'd sub nom. Haessly v. Commissioner, 68 F. App'x 44 (9th Cir. 2003), and aff'd sub nom. Umbach v. Commissioner, 357 F.3d 1108 (10th Cir. 2003). Exclusions from gross income are construed narrowly, and a taxpayer must clearly establish her entitlement to any such exclusion. Id. at 101.

Section 911(a)(1) provides that a "qualified individual" may elect to exclude from gross income, subject to limitations set forth in subsection (b)(2), her "foreign earned income." Foreign earned income is "the amount received by such individual from sources within a foreign country or countries which constitute earned income attributable to services performed by such individual." Sec. 911(b)(1)(A). Respondent does not dispute that the compensation petitioner received as a contractor in Afghanistan was "foreign earned income."

To be a "qualified individual" entitled to this exclusion, a taxpayer must satisfy two distinct requirements. First, she must either be a "bona fide resident" of one or more foreign countries or be physically present abroad for a specified pe-

[*12] riod.  Sec. 911(d)(1).  Second, she must show that her "tax home is in a foreign country."  Sec. 911(d)(1) (flush language).  The foreign residency and tax home requirements entail overlapping inquires, but we address them in turn.

### A.  Foreign Residency

#### 1.  Bona Fide Residence

Under section 911(d)(1)(A) a taxpayer must "establish[] to the satisfaction of the Secretary that * * * [she] has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year."  We have construed this provision "to set a higher-than-ordinary standard of proof-- i.e., 'strong proof'--of bona fide resident status in a foreign country."  Acone v. Commissioner, T.C. Memo. 2017-162, 114 T.C.M. (CCH) 219, 221 (citing Schoneberger v. Commissioner, 74 T.C. 1016, 1024 (1980)).  This standard of proof "is higher than preponderance of the evidence."  Ibid.  Petitioner contends that she was a bona fide resident of Afghanistan during 2012-15, and we agree.

Whether an individual has taken up bona fide residence in a foreign country depends on the facts and circumstances of the case.  The factors that courts have consulted in determining bona fide residency include the following:  (1) intention of the taxpayer; (2) establishment of her home temporarily in the foreign country for an indefinite period; (3) participation in the activities of her chosen community

[*13] on social and cultural levels, identification with the daily lives of the people, and, in general, assimilation into the foreign environment; (4) physical presence in the foreign country consistent with her employment; (5) nature, extent, and reasons for temporary absences from her temporary foreign home; (6) assumption of economic burdens and payment of taxes to the foreign country; (7) status of resident contrasted to that of transient or sojourner; (8) income tax treatment accorded by her employer; (9) marital status and residence of her family; (10) nature and duration of her employment and whether assignment abroad could be completed more expeditiously; and (11) whether residence abroad reflects good faith (as opposed to a tax evasion purpose). Sochurek v. Commissioner, 300 F.2d 34, 38 (7th Cir. 1962), rev'g and remanding 36 T.C. 131 (1961); Schoneberger, 74 T.C. at 1023. The "uninterrupted period" that includes an entire taxable year may be established even if "temporary visits" to the United States or other locations are made during that time. Sec. 1.911-2(c), Income Tax Regs. While all of the factors listed above may not be present in every case, the applicable factors should be considered and weighed. Sochurek, 300 F.2d at 38.

Several of these factors weigh strongly in petitioner's favor. The U.S. Court of Appeals for the Fifth Circuit has observed that "intent plays perhaps the most important part in determining the establishment and maintenance of a foreign resi-

[*14] dence." <u>Jones v. Commissioner</u>, 927 F.2d 849, 854 (5th Cir. 1991), <u>rev'g</u> T.C. Memo. 1989-616. Petitioner testified that she intends to work as a contractor in Afghanistan for as long as such jobs remain available to her. We found that testimony entirely credible.

Objective indicia of petitioner's intent include the fact that, after her contract with AC First ended in April 2016, she secured the promise of another job at Kandahar Airfield (contingent on funding) before returning to the United States. Upon arrival in Texas, she did not search for jobs domestically. Rather, while waiting to see whether the DynCorp job came through, she looked for work only with other overseas contractors. She repeatedly turned down opportunities to pursue jobs in the United States, even when offered by ex-military friends.

Petitioner has not worked in the United States since 2011. Including her military service, she has spent most of her adult life working in the Middle East, uniformly in war zones. When these cases were tried, she was still working as a defense contractor in Afghanistan, and she delivered her testimony from Kandahar Airfield. This is not the track record of a "transient or sojourner" abroad. <u>Sochurek</u>, 300 F.2d at 38.

The nature and duration of petitioner's employment also support her foreign residency. She worked a demanding schedule that necessitated her physical pres-

[*15] ence on the base. Although she had a series of one-year contracts, those contracts were reliably renewed for five years. See Linde v. Commissioner, T.C. Memo. 2017-180, 114 T.C.M. (CCH) 314, 319 (finding that a DynCorp contractor in Iraq expected one-year contracts to be extended indefinitely). How her employer treated her income tax status is another factor in her favor: AC First advised that she was eligible for the FEI exclusion and explained how she could elect to have no U.S. tax withheld from her wages. Needless to say, her presence in Afghanistan reflected nothing but "good faith." Sochurek, 300 F.2d at 38.

Several factors that respondent regards as adverse to petitioner seem neutral to us, given the unique circumstances of her life in Afghanistan. Because Afghanistan was a war zone, petitioner and other civilian contractors were generally forbidden to leave the base. She was therefore limited in her ability to "participat[e] in the activities of * * * [her] chosen community," see ibid., to the extent that community is understood as the broader Afghan society. However, she did fully assimilate into the only community she had available to her: the 50,000 people who lived and worked at Kandahar Airfield. As explained supra p. 6, petitioner formed close friendships within this community and participated in its activities to the fullest extent possible.

**[\*16]** Likewise, although petitioner lived in employer-provided housing and did not acquire her own space, she had no other housing option available to her. She did not learn Pashto or Dari or participate in activities with the local Afghan community. But assimilation of this sort was a practical impossibility: She was forbidden to leave the base, and most Afghans with whom she interacted had little interest in conversing with her. She could not stay in Afghanistan legally without employment, and her employment was structured as a series of one-year contracts. But those contracts were renewed regularly for five years by AC First, and her subsequent contracts were renewed regularly by DynCorp.

Other factors also favor petitioner or seem neutral. During 2012-15 she spent the bulk of her time physically in Afghanistan. When she had time off, she had no option to travel within that country. Understandably she selected other travel destinations--Thailand, Australia, Monaco, France, Romania, Tanzania, Kenya, the United Arab Emirates, and the Maldives--which she visited alone or with friends from the base. She was unmarried and had no children; her trips to Texas were not to visit family but to check on her house.

At least one factor is adverse to petitioner. She assumed few economic burdens by living in Afghanistan because she did not pay for lodging or most meals, and she paid no tax in Afghanistan. But having weighed all the factors, and giving

[*17] special consideration to her intent, which we found to be clear, we hold that petitioner has supplied the "strong proof" necessary to carry her burden of proving that she was a bona fide resident of Afghanistan during 2012-15.

Our analysis on this point differs for 2016. It is well established that each tax year stands by itself and "must be separately considered." Pekar v. Commissioner, 113 T.C. 158, 166 (1999). In April 2016 petitioner lost her job with AC First because of a reduction in force. She returned to Texas and lived there until December 24, 2016, when she departed for her job with DynCorp in Afghanistan. While between jobs, she lived at her house in Pflugerville and collected Texas unemployment compensation. She also registered her car and used it while in Texas. She voted in 2016 even though she had not voted while living in Afghanistan. Because the balance of factors weighs against petitioner for 2016, we find that she was not a bona fide resident of Afghanistan in that year.[3]

2.   Physical Presence

Alternatively, a taxpayer can be a "qualified individual" by meeting the 330-day physical presence requirement. This requires that the taxpayer, "during any

---

[3]Petitioner cannot be a bona fide foreign resident on a part-year basis. See Dawson v. Commissioner, 59 T.C. 264, 270-271 (1972). Section 911(d)(1)(A) provides that an individual seeking to meet this requirement must do so "for an uninterrupted period which includes an entire taxable year."

**[\*18]** period of 12 consecutive months, * * * [be] present in a foreign country or countries during at least 330 full days in such period." Sec. 911(d)(1)(B). Petitioner contends that she satisfies this test for the portion of 2016 during which she was in Afghanistan, and we agree.

Petitioner's job with AC First terminated on April 19, 2016; she departed for the United States that same day, arriving in Texas on April 21, 2016. The 12-month period during which petitioner's physical presence may be tested thus ran from April 20, 2015, through April 19, 2016. See Struck v. Commissioner, T.C. Memo. 2007-42, 93 T.C.M. (CCH) 928, 930 (finding taxpayers eligible for FEI exclusion for 2002 using an applicable period from May 16, 2001, to May 15, 2002); sec. 1.911-2(d)(1), Income Tax Regs. ("The twelve-month period may begin before or after arrival in a foreign country and may end before or after departure.").

During the 12-month period beginning April 20, 2015, petitioner was present in the United States for only 17 days, between June 7 and June 23. She was thus "present in a foreign country or countries during at least 330 full days in such period." Sec. 911(d)(1)(B). However, because the applicable period used for the physical presence test does not correspond with petitioner's calendar taxable year, a pro rata adjustment to her FEI exclusion for 2016 will need to be made under sec. 1.911-3(d), Income Tax Regs. See Struck, 93 T.C.M. (CCH) at 932 n.8.

[*19]  B.     Foreign Tax Home

In order to be a "qualified individual" as defined by section 911(d)(1), a tax-payer must satisfy not only the "bona fide residency" or physical presence test. She must also show that her "tax home is in a foreign country."  Sec. 911(d)(1) (flush language).  Section 911(d)(3) defines the term "tax home" to mean, in the case of an individual, "such individual's home for purposes of section 162(a)(2)." Under section 162(a)(2), a person's home is generally considered to be the location of her regular or principal place of business.  See Mitchell v. Commissioner, 74 T.C. 578, 581 (1980).  For petitioner, this is Afghanistan.

However, section 911(d)(3) goes on to provide that "[a]n individual shall not be treated as having a tax home in a foreign country for any period for which * * * [her] abode is within the United States."  Thus, if petitioner's "abode" during 2012-16 was in the United States, she cannot establish that her tax home was in Afghanistan.  See Jones, 927 F.2d at 856; Harrington v. Commissioner, 93 T.C. 297, 303 (1989).  The "foreign tax home" requirement is evaluated using the "same applicable period used * * * for the bona fide residence or the physical presence re-

[*20] quirement." <u>Struck</u>, 93 T.C.M. (CCH) at 930; <u>see</u> sec. 1.911-2(a), Income Tax Regs.[4]

The term "abode" has been "variously defined as one's home, habitation, residence, domicile, or place of dwelling," and it "has a domestic rather than [a] vocational meaning." <u>Bujol v. Commissioner</u>, T.C. Memo. 1987-230, 53 T.C.M. (CCH) 762, 763-764 (quoting Black's Law Dictionary (5th ed. 1979)), <u>aff'd without published opinion</u>, 842 F.2d 328 (5th Cir. 1988). To determine a taxpayer's "abode" for a particular period under section 911(d)(3), we compare and contrast "the taxpayer's domestic ties (i.e., his familial, economic, and personal ties) to the United States with his ties to the foreign country in which he claims a tax home." <u>Haskins v. Commissioner</u>, 820 F. App'x 994, 995 (11th Cir. 2020) (quoting <u>Harrington</u>, 93 T.C. at 307-308), <u>aff'g</u> T.C. Memo. 2019-87. Although any taxpayer working in a foreign country will "invariably have some connections" with that country, "if his ties to the United States are stronger, we have held that his 'abode'

---

[4]Section 911(d)(3) currently provides that the requirement of a foreign abode does not apply if the taxpayer "is serving in an area designated by the President * * * as a combat zone * * * in support of the Armed Forces of the United States." That proviso was added in 2018 and thus has no application to these cases. <u>See</u> Bipartisan Budget Act of 2018, Pub. L. No. 115-123, sec. 41116(a), 132 Stat. at 161.

[*21] remains in the United States." Evans v. Commissioner, T.C. Memo. 2015-12, 109 T.C.M. (CCH) 1052, 1055.

Considerations for determining the taxpayer's "abode" include the amount of time spent in each country, the residence of close family members, community involvement, banking activity, property ownership, and recreational activities. See Wentworth v. Commissioner, T.C. Memo. 2018-194, 116 T.C.M. (CCH) 506, 510. "Maintenance of a dwelling in the United States by an individual, whether or not that dwelling is used by the individual's spouse and dependents, does not necessarily mean that the individual's abode is in the United States." Sec. 1.911-2(b), Income Tax Regs.; see, e.g., Harrington, 93 T.C. at 309 (finding a U.S. abode where the taxpayer spent almost half his time in the United States with his family, maintained bank accounts in the United States, attended church in the United States, and owned vehicles in the United States); Acone, T.C. Memo. 2017-162, 114 T.C.M. (CCH) 219, 222 (finding a U.S. abode where the taxpayer spent so much time at his family's home in New Hampshire that he "continue[d] to be the one who mowed the grass there"); Daly v. Commissioner, T.C. Memo. 2013-147, 105 T.C.M. (CCH) 1850, 1853 (finding a U.S. abode where the taxpayer worked abroad for fewer than 110 days annually and derived less than half his income from work overseas).

[*22] We consider petitioner's ties to Afghanistan in the light of the "nature of the region" and the "unique circumstances" of her work. See Wentworth, 116 T.C.M. (CCH) at 510. Petitioner had a Texas driver's license, but it was a condition of her employment that she be licensed to drive in the country that issued her passport. She had a U.S. bank account, but that was necessary to enable her employer to make direct deposit of her paychecks. Opening a local bank account or buying property in Afghanistan would have been impracticable if not impossible, given the requirements of her security clearance and the ban on leaving the base. Petitioner worked 12 hours a day in Afghanistan, with a half-day off every 14 days. Despite the strenuous demands of her work, she managed to have a full social life, including visiting restaurants and shops on the boardwalk, cooking with friends, and pursuing her weightlifting hobby.

Petitioner had limited family and personal ties to the United States. She was unmarried and had no children; although she visited her parents in Boston occasionally, she spent a significant amount of her vacation time traveling to other foreign countries. Cf. Cobb v. Commissioner, T.C. Memo. 1991-376, 62 T.C.M. (CCH) 408, 412 (discounting the significance of occasional U.S. family visits that were "limited by convenience"). Her house in Pflugerville remained unoccupied, so she did not have to manage any tenants. She often let her car registration lapse

**[*23]** and thus rented a car when visiting Texas. She spent fewer than 43 days in the United States in 2012, 2013, and 2015, and zero days in 2014. The only wages she earned during these years were derived from her job in Afghanistan.

Most of petitioner's close friends were other contractors who also lived and worked in Afghanistan. She credibly testified that she felt closer to these colleagues than she had felt (for example) to her former co-workers at Dell. At one point she dated another contractor working overseas. She planned to work as a contractor in the Middle East for as long as such jobs remained open to her. Cf. Haskins, T.C. Memo. 2019-87, 118 T.C.M. (CCH) 63, 65 (noting that a contractor in Afghanistan described herself as "miserable" and asked how soon she could return to the United States "without getting in trouble with the IRS").

This Court has previously found that civilian defense contractors working overseas can have "abodes" outside the United States, so long as they have stronger ties to the foreign country than to the United States. See Wentworth, 116 T.C.M. (CCH) at 510-511 (finding that taxpayer's tax home was in Iraq); Linde, 114 T.C.M. (CCH) at 318 (same). We find that petitioner's ties to the United States during the relevant period were much weaker than her ties to her community in Afghanistan. We thus find that her tax home was in Afghanistan from the start of 2012 until she left Afghanistan in April 2016. See Struck, 93 T.C.M. (CCH)

**[*24]** at 930 ("The foreign tax home requirement * * * is to be evaluated during the same applicable period used by a taxpayer for the bona fide residence or the physical presence requirement.").

II.     Late-Filing Addition to Tax for 2015

Section 6651(a)(1) provides for an addition to tax of 5% of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file the return, not to exceed 25% in toto.  As in effect during 2016, however, section 7508 allowed an extension of time to file to taxpayers who were serving in support of the U.S. Armed Forces in an area designated by the President as a combat zone.  The parties agree that petitioner was serving in support of the Armed Forces and that Afghanistan was a combat zone during 2016.

The normal deadline for individual taxpayers to file returns for 2015 was April 18, 2016.[5]  Under section 7508(a)(1)(A), petitioner's "period of service" in the combat zone before the deadline "and the next 180 days thereafter" are disre-

---

[5]Traditionally, the filing deadline for individual tax returns is April 15. However, the District of Columbia recognizes Emancipation Day, April 16, as a holiday.  In 2016, Emancipation Day fell on a Saturday, so the holiday was observed the preceding Friday, April 15.  If a filing deadline falls on a weekend or a legal holiday in the District of Columbia, the deadline is extended until the following business day.  See sec. 7503.  Accordingly, the deadline for individual taxpayers to file returns for 2015 was extended to April 18, 2016, the following Monday.

[*25] garded in determining whether her 2015 return was timely filed. Petitioner was in a combat zone from January 1 through April 19, 2016, the date of her departure from Kandahar Airfield. In determining her filing deadline, therefore, 289 days are disregarded--those 109 days plus 180 days. See Rev. Rul. 76-425, 1976-2 C.B. 447 (1976); IRS Publication 3, Armed Forces' Tax Guide 25 (2015).

Petitioner's extended filing deadline was therefore 289 days after April 19, 2016, or February 2, 2017. She did not file her 2015 tax return until October 26, 2017. However, she returned to Afghanistan, which remained a combat zone, on December 24, 2016, before her 2015 return was due. Section 7508(a) thus entitled her to another extension of time to file while she remained in that combat zone. She remained in Afghanistan continuously through October 26, 2017 (and thereafter). Her 2015 return was thus timely filed, so she is liable for no addition to tax under section 6651(a)(1) for that year.

To reflect the foregoing,

Decisions will be entered under

Rule 155.